AUDITOR GENERAL, RELATOR .v. STATE TREASURER.

*Constitutional construction—"Extinguishment" of debt.*

The Michigan Constitution provides that certain revenues shall be applied to paying the interest upon educational funds and the interest and principal of the State debt "until the *extinguishment* of the State debt" when they shall constitute a part of the Primary School Interest Fund (Art. xiv., § 1). *Held* that for the purposes of the requirement, the debt is to be considered "extinguished" when there is

45 MICH.—11

money enough in the State treasury, not subject to other claims, to pay it, even though it has not matured and has not been actually paid.

Mandamus to the State Treasurer to transfer the surplus of specific taxes in the treasury to the Primary School Interest Fund. Submitted Oct. 20, 1880. Granted Jan. 7, 1881.

*Ashley Pond* for relator.

Attorney General *Otto Kirchner* for respondent.

GRAVES, J.   This is an amicable application to the Court to obtain an interpretation of an important part of Article 14 of the Constitution.*

The question raised is whether that portion of the pledged specific taxes not required for interest on the educational funds, and which the treasury is to collect and hold for State indebtedness, and which has now outgrown that indebtedness, is so controlled by the words of the Constitution that it must hereafter be allowed to keep accumulating in the treasury, not only until the whole debt is due in 1890, but until it is entirely extinguished, however remote the event, and notwithstanding the amount of accumulation may prove to

---

*ARTICLE XIV.

SECTION 1.   All specific State taxes, except those received from the mining companies of the Upper Peninsula, shall be applied in paying the interest upon the Primary School University, and other educational funds, and the interest and principal of the State debt, in the order herein recited, until the extinguishment of the State debt, other than the amounts due to educational funds, when such specific taxes shall be added to and constitute a part of the Primary School Interest Fund.   The Legislature shall provide for an annual tax, sufficient, with other resources, to pay the estimated expenses of the State government, the interest of the State debt, and such deficiency as may occur in the resources.

SEC. 2.   The Legislature shall provide by law a sinking fund of at least twenty thousand dollars a year, to commence in eighteen hundred and fifty-two, with compound interest at the rate of six per cent per annum, and an annual increase of at least five per cent, to be applied solely to the payment and extinguishment of the principal of the State debt, other than the amounts due to educational funds, and shall be continued until the extinguishment thereof.   The unfunded debt shall not be funded or redeemed at a value exceeding that established by law in one thousand eight hundred and forty eight.

be many times larger than the debt for the satisfaction of which the provision was intended.

In October last the State debt was $905,149.97 and the balance to the credit of the sinking fund was $1,208,895.27, and should the present practice continue of adding the residuum of the specific taxes, the amount in 1890 will probably exceed $3,000,000.

The attorney general, speaking on the side of the State treasurer, argues that the words of section one must be taken literally, and that they unavoidably require that the specified annual residuum of these taxes shall be added without interruption or abatement to the fund for the discharge of the State debt and interest, whether needed therefor or not, until they are extinguished.

The relator's counsel, admitting the literal sense of the provision to be as represented, yet strongly contends that there are insuperable objections to the adoption of a literal meaning. He argues that an attempt to carry out such a construction can end only in rendering the article hopelessly impracticable; that the case is one where it is indispensable to deviate from the literal import and to seek for and accept that ulterior sense which is called for by the end intended; that if this rule is observed all difficulties will disappear, and it will be found that the real object was to make sure provision for meeting the public obligations by means of a scheme imbedded in the Constitution, and that there was no ground or motive for a regulation to gather and impound a fund of indefinite amount, and which could not be put to any use connected with the object of the provision, and would most likely, under the theory of literal interpretation, be screened from any other, and that an intention to effectuate such a state of things ought not to be imputed.

The question is one of high practical importance, but the ground of discussion is very narrow. It is fully opened by the statement of the points.

Neither the condition of the finances nor the state of public opinion in 1850 will facilitate a solution. It might be expected that the proceedings of the Convention would

give some clue to the precise manner in which it was understood this section (§ 1, Article 14) should actually operate in the contingency which has occurred, but they do not. True, a member suggested that a surplus might arise, but the remark was made and understood evidently as a mere casual observation in the course of debate and too fanciful to be noticed, and it seems not to have been noticed.

There was much difference of opinion relative to the proper disposition of the specific taxes. Some thought they ought to be used exclusively to pay the interest on the State debt, and to cancel the principal. Others believed they should be devoted wholly to the primary school and other educational funds.

A further question was whether specific taxes from corporations in the Upper Peninsula should be included in the general disposition, or be so left that the legislature might, if it was deemed best, appropriate them, or a part at least, to local objects of necessity in that territory; and lastly, it was strenuously urged by several gentlemen, that certain corporations paying specific taxes and holding large amounts of property in particular localities, ought to be subject to municipal taxation in common with other property holders in the same vicinity.

The entire Convention was earnestly in favor of placing the educational system on a high and sure foundation, and the plan of free schools had the support of a large majority. It was believed by many of its supporters that full operation of the scheme would be much hastened by a liberal application of these taxes in favor of education, and they were anxious to make that the chief, if not the exclusive purpose to which they should be devoted. But this was resisted by those who contended that the State debt was to be preferred, and also by others who wished to leave the subject to legislation. The result was in effect a compromise.

It was ruled by the majority that the specific taxes on mining companies in the Upper Peninsula should be left to legislation, and that for the time being the interest accruing on the educational funds should be first paid out of the other

specific taxes, and that what might remain, if anything, should be absorbed by the interest on the State debt, and by the debt itself, so long as it should exist. The claim for local taxation on companies paying specific taxes was not embodied.

The Convention proceeded under the evident belief that the interest on the educational funds would so nearly consume the taxes that the residue would not be enough to make any serious impression on the principal of the State debt, and that its final extinguishment would ensue from other resources devised and contemplated by the Constitution. The expedient of a sinking fund as marked out in section two was viewed as being the main and efficient instrumentality for effacing the existing general debt. No one seems to have made a methodical calculation of probabilities respecting the time in which the debt, funded and fundable, and then being $2,529,872.87, would be paid under the scheme of the Convention. But all considered that its extinguishment could not be expected in less than a quarter of a century, and one gentleman observed that before it could be accomplished the Constitution would be again revised, and opportunity would be thus presented for contriving such a disposition of these taxes as might be deemed best. There were proposals that their application on the State debt should come to an end in 1852, in 1855, in 1865, and in 1880, and 1852 was agreed on. It was already understood that whenever such application should cease, they were to pass to the Primary School Interest Fund, and without being charged with the interest on the other educational funds. Some members who felt particular solicitude about this interest, and several who felt that these taxes, or at least a portion of them, had been devoted by the legislature to the payment of the State debt, were, as may be gathered from the proceedings, not satisfied with this arrangement. The latter in particular were apprehensive that so early a withholding the whole of these taxes from application on the State debt, however meager the resource they might afford, and without reference to the forwardness of the means of payment through other

channels, would appear like bad faith to the public creditors. After some consideration and the lapse of a short time, and at the instance of the chairman of the committee, the fixed date was dropped and the present phraseology inserted.

Turning from the debate to the final work of the Convention, it seems certain that as to the question before us the language was not cautiously chosen. The expressions in section one cannot be allowed to carry their literal sense without leading to confusion and involving various consequences too unreasonable to be defended; and it would be an affront to common sense to suppose that any such result was intended. As argued by counsel, the extinguishment spoken of, if contemplated in the dry and strict sense of the word and in reference to the subject-matter, would be an actual satisfaction by means of payment; and as nothing more could be applied in paying the debt than the amount of the debt, and nothing could be so applied in actual satisfaction before the maturity of the debt unless by the voluntary assent of the holders, and the full amount of the debt being already obtained in advance of its arrival at maturity, and the holders not consenting to receive payment in fact, the application of an accruing excess must be and remain naturally impossible.

The second section, which is closely associated in purpose with the first, required the legislature to create a sinking fund of $20,000 a year, commencing in 1852, with compound interest at six per cent., and an annual increase of at least five per cent. to be applied solely to the payment and extinguishment of the principal of the State debt, and declared it should "be continued until the extinguishment thereof." This requirement, it was expected, would be met by taxation. No other resources could have been contemplated.

It was a matter of plain sense that whenever the sinking fund should come to be equal to the principal of the debt nothing would be left to which a further accumulation could possibly apply. Such would be the natural effect. The specification of the object and the express declaration that it should be used therefor would moreover bespeak a purpose

to exclude whatever might be accumulated, from any different use. And it was not impossible that the fund might grow to an equality with the debt before the latter would mature and long before it would be possible to cancel every fraction of it.

Yet by the terms of the section literally expounded the process of accumulation was not to cease on the acquisition of enough to satisfy the debt and on occasion of the complete exhaustion of the object, but was to be kept up so long as the debt, for any reason, accidental or otherwise, should remain uncancelled. Now, in devising this plan, was it the meaning of the Convention that after the obtainment of a sufficient sum to fully and effectually clear off the debt, and whilst holding the means on hand for actual application, there should be no pause, and the inflow should be hence maintained with entire indifference to the fact of the fund being full already, and should be continued so long as a particle of the debt should happen to escape positive extinguishment? If so, the conclusion could scarcely be avoided that there was a covert purpose in the Convention to create by vague provisions and under a deceptive color what, in effect, would be a second fund not appointed to any use and of indefinite amount and enveloped in doubt respecting its legal availability even if admitted to be accessible without an amendment of the Constitution. Grant that the literal sense is the true one, and the difficulties indicated are irrepressible. A fund must be drawn from the people for no other end than to be locked up in the treasury until the debt for which it is not needed is finally satisfied by other means, and in the interim, which cannot be measured, the Primary School Interest Fund must be deprived of the incalculable aids which would naturally flow from it if allowed to receive it. The same narrow sense being appropriated to the *status* of the accumulated excess, and the fund cannot escape being regarded as devoted by the Constitution to an object which, so far as concerns the possibility of application, has no existence.

It is required that the entire amount brought in under the

provision shall be "applied solely to the payment and extinguishment of the principal of the State debt." The right to make use of the whole or of any part for any different purpose is excluded. But the amount necessary to take up the debt being on hand under the proper regulation, no debt remains to receive the application. Speaking potentially, it is paid. Among the consequences, therefore, of a literal reading in the case actually before us, we see that the treasury must accumulate what in substance is the same as two funds, one to be the full equivalent of the State debt, being the clear and unquestioned object of the Constitution, and the other an anomaly without utility or object, involving loss to the community and burdening the treasury with care and responsibility without any sound reason.

This view cannot be maintained, and being rejected, we have not far to seek the natural alternative. What was the substantial object of the Convention as disclosed by the debates and evinced by the result, and what is the spirit and essence of the constitutional provision?

The final purpose, so far as it concerns our present inquiry to refer to it, was to make certain the preservation of the public faith and the punctual payment of the existing State debt, together with the interest. And as subsidiary to this end the State was placed under many restrictions to prevent it from running into new debts, or in any way impairing its ability to maintain financial independence and discharge its obligations. And as the most pregnant parts of the policy directed to the end here mentioned, the Convention ordained the creation of the sinking fund, and as a sort of supplementary or superadded security, devoted to the same important object whatever remnant there might be of the specific taxes in question, after payment of the interest on the educational funds. Their eventual application exerted influence.

It was not difficult, in view of the various other provisions destined to facilitate the payment of the debt, for those who made it a leading object to secure the permanent addition of these taxes to the Primary School Interest Fund, to accept as a condition that full application to the fund should be deferred

until such time as the means of discharging the State debt should be in the treasury, and either waiting for it to mature, or waiting for the lawful evidences to be presented. But they would never have consented that such application should not only be delayed until the debt should be so met, but for such further and uncertain time as might elapse before the literal extinguishment of the last dollar of it. Against a condition not only so impolitic and so uncalled for but so repugnant to common sense, they would have raised objections equally plain and decisive.

Further enlargement on the question is not deemed needful. The result reached is that there being no arrears of interest on the State debt in question, and the fund accumulated being sufficient for the payment of the principal, and being now held in the treasury applicable thereto and in readiness therefor whenever the creditors will receive it, any excess, apart from what shall be annually required to meet the annual interest accruing on the debt, must be held applicable under the Constitution, so long as there is no failure in the fund for the payment of the principal, to the Primary School Interest Fund, and ought to be assigned thereto.

MARSTON, C. J. and COOLEY, J. concurred.

CAMPBELL, J., dissenting. I regret that in a matter of so much importance I cannot agree in the result arrived at by my brethren. But I am unable to do so.

If there were any ambiguity in the language of the Constitution, there would, perhaps, be room to consider what may be supposed to have been contemplated by the Convention as necessary to be provided for in order to secure the public credit, and to get as near to that result as the language would allow. But it must be remembered that the adoption of the Constitution by the popular vote was the adoption of the language as written, and of nothing else. So far as this particular provision is concerned it has not been suggested or supposed that it was ever discussed before the people as a separate clause at all. Neither have I been able to find any-

thing to indicate that any member of the Convention failed to suppose the language would be literally construed. The debates, as referred to by my brother Graves, indicate clearly enough that the possibility, at least, of an accumulated surplus existed. The real difficulty seems to me to be no more than this—that if the Convention had foreseen the amount of this accumulation, it would have been limited in some way. But this will not warrant us in imposing a limitation which, as I read the Constitution, is not to be found there. While I do not conceive that any result arising from the terms of that document can be evaded, and while, therefore, I build no argument upon its reasonableness, I do not think the provision, even in the light of the facts shown by the record, so remarkable as to lead to anything absurd or grossly unreasonable.

The clause is express that the fund shall not be impaired until the "*extinguishment*" of the State debt, aside from that due to the educational funds. It cannot be claimed that the debt is extinguished until it is paid or released. It seems to me that it cannot be said that a State debt is extinguished when money enough is saved to meet it, any more than that a private debt is extinguished by a similar accumulation. And the distinction between payment and mere ability to pay is too obvious to have escaped the notice of the Convention. If they had meant to confine the accumulation to the amount of the debt, it is hard to suppose they would not have said so. But it is enough that they did not say so, but on the contrary required the debt to be extinguished before applying the fund elsewhere.

It was suggested on the argument that this would enable any single creditor, by withholding his bonds, to prolong the delay indefinitely. This is not so. As soon as the debt is due it is clearly competent for the legislature to compel the creditor to present his claim or have it paid by deposite in some appointed place. The legislative power can provide for such cases, and has done so in many instances. It is a very common practice where private property is taken for public use, and is neither anomalous nor unjust.

I have suggested that the clause does not appear to me so unreasonable as counsel seem to regard it.   And while, as before stated, the reasonableness or strangeness of an unambiguous clause is no legal cause for failing to enforce it, it is nevertheless proper to consider the circumstances of its enactment, as well as the contingencies which may arise concerning the fund itself.   The Convention, as is universally admitted, meant that there should be no question about the payment of the State debt, so far as they could secure it. Without reference to other possibilities there are two that have actually become facts which, if existing on a somewhat larger scale, would have prevented this accumulation.   In the first place a very large defalcation occurred at the close of 1860 by the embezzlement of a part of this very fund.   All that was then on hand in the treasury was taken.   The same possibility and the same disposition at this time would have saved the necessity of the present application.

In the second place there is no constitutional limit to the amount of debt that may be incurred for war purposes and the defense of the State.   We made a considerable addition to our debt in that way, and the public credit, which the Constitution has pledged as secured by this fund, might easily have needed all and more than all of the earnings, had not other resources diminished the amount necessary to be borrowed.   This is a necessity which is not likely to arise often, but which was distinctly provided for and guarded.

As for the circumstances under which the Convention acted, they are no less significant.   The public debt then existing had been incurred chiefly for internal improvements, and the honor of the State had been specifically pledged to apply the avails of the improvement funds to the payment of the debts.   This was partially done by allowing the purchasers of the railroads when sold, to pay for them in bonds. But this did not pay off the whole debt, and while the funds had been frittered away to a large extent this very fact showed the duty of the State to provide some adequate security for its creditors.   This was found possible only by

pledging some specific source of revenue.  The specific taxes were tangible and they were the only State revenues that were.  A sinking fund was also made subsidiary.  This requiring legislative action was not strictly obeyed, and no court could coerce the legislature.  The specific taxes, so long as levied, could be reached.

The special charters providing for specific taxes, and which as contracts could not be changed, were very few in number, and the taxes were not large in amount.  They would never have sufficed to pay principal and interest on the debt.  The Constitution prohibited any future special charters, and no contract was thereafter possible.  The legislature could impose and abolish specific taxes on all future corporations at its pleasure.  It was therefore entirely competent at any time to prevent the overgrowth of this fund by legislation.

It was also competent, and it is evident from the Constitution, as well as from the debates, that it was thought likely that the Constitution might be amended, if not remodelled, long before any possible accumulation would need attention.  While the legislature cannot by its own action change the Constitution, it can propose changes which the people can adopt.  There has never been a time when this remedy was not available, if generally desired.

Under all these circumstances it is not strange that the Convention refused to limit the accumulation, and required it to continue until suspended by the amendment of the Constitution.  Beyond what is written we have no means of knowing what was thought or what would have been done, had the Convention seen into the actual future.  The accumulation which they absolutely required would even now be entirely inadequate.  It is only because specific taxes have been multiplied that we have any surplus.  The legislature have seen fit to add to the fund, and have not seen fit to take any measures to procure a change of its constitutional uses.

I think the meaning of the Constitution is not open to any construction which will allow the fund to be diverted or used in the manner asked by the relator.