## Lambert, Mayor v. Bd. Trustees Public Library, etc.

(Decided January 24, 1913.)

### Appeal from Daviess Circuit Court.

1. Statutes—Construction of Statutes—Statutes Passed at Same

Session of Legislature—Rule as to Construction of.—The rule that statutes *in pari materia* should be construed together, applies with peculiar force to statutes passed at the same session of the legislature; it is to be presumed that such acts are imbued with the same spirit, and actuated by the same policy, and they are to be construed together as if parts of the same act.

2.    Statutes—Statutes . Passed at Same Session of Legislature— . How Construed.—Where two statutes are passed at the same session of the legislature, they should be so construed, if possible, as to harmonize; and force and effect should be given to the provisions of each; if, however, they are necessarily inconsistent, a statute which deals with the common subject-matter in a minute and particular way will prevail over one of a more general nature; and, of two inconsistent statutes enacted at the same session, that will prevail which takes effect at the later date, unless there is some other circumstance to show a contrary intention.

3.    Statutes—Conflicting Acts Passed at Same Session of Legislature—One Containing Emergency Clause.—Where two conflicting acts upon the same subject-matter were passed at the same session of the legislature, and were approved on the same day by the Governor, and their conflict is such that they can not be harmonized and stand together, and one of them contains an emergency clause, and the other does not, the one containing the emergency clause must be taken to overcome the other.

4.    Statutes—Conflict of Acts—Fact of Emergency Clause—What It Tends to Show.—The fact of there being an emergency clause tends to show that the subject-matter of the act was more clearly and pointedly before the legislature than the subject-matter of the other act.

5.    Constitutional Law—Section 179 Applies to Private Corporations.— Section 179 of the Constitution, which prohibits the general assembly from authorizing any city to appropriate money for any corporation, association or individual, except for the purpose of constructing or maintaining bridges, turnpike roads or gravel roads, applies to private corporations, and does not apply to public corporations, which are merely government institutions, created by law, for the administration of the public affairs or the community.

6.    Corporations—Public Corporations Subject to Legislative Control— Control Does not Arise in Contract—Property of not Subject to Taxation.—A public corporation is subject to legislative control, without any reference to the consent of the persons who control it; it does not originate in contract, while a private corporation does so originate, and the instrument creating a private corporation can not be altered or amended by the lawmaking power without the consent of the members who compose it, unless such power is expressly reserved.    On the contrary, public corporations are mere creatures or instrumentalities of the State, and are subject to governmental visitations and control, and their property is not taxable, while that of a private corporation is taxable.

7.    Corporations—Public Library—Corporation Created for Management

of is Public Corporation.—A corporation created under a general law for the management of a public library supported by taxation, is, in no sense, a private corporation; it is a public corporation existing at the will of the legislature.

8. Constitutional Law—Appropriation of Part of School Fund for Library Purposes—Violative of Section 180 of Constitution.—A provision of a statute which appropriates for library purposes, three per centum of the net amount raised for common school purposes violates section 180 of the Constitution, which requires that every ordinance which levies a tax shall specify the purpose for which the tax is levied, and that it can not be used for any other purpose.

9. Constitutional Law—Statute Requiring City Council to Annually Levy Special Tax for Support of Library—Violative of Section 157 of Constitution.—The provision of a statute which requires the general council of a city to annually and perpetually levy a special tax for the support of a public library, violates section 157 of the Constitution, which provides, among other things, that no city shall be authorized to become indebted, to an amount exceeding, in any year, the income and revenue provided for such year, without the assent of two-thirds of the voters thereof voting at an election to be held for that purpose.

10. Constitutional Law—Public Library—City Council May Make Annual Appropriation for Support of.—Section 157 of the Constitution, does not, however, prohibit a city council from making an appropriation out of the annual revenues for the support of a public library.

GEORGE W. JOLLY and HORACE JOLLY, for appellant.

DEAN & DEAN, for appellees.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

Owensboro is a city of the third class. At its regular session in 1902, the General Assembly passed two Acts providing for the establishment of public libraries in cities of the third class. Both Acts were approved by the Governor on March 21, 1902. The first Act denominated "Chapter 65" (Acts 1902, page 147), is entitled "An Act to provide for the establishment of free libraries and reading rooms in cities of the third, fourth, fifth and sixth classes." (Ky. Sts. 1909, sec. 3480a). It contained no emergency clause, and by the terms of the Constitution it took effect ninety days after the adjournment of the General Assembly. The other Act, known as "Chapter 70" (Acts 1902, page 155), is entitled "An Act authorizing the establishment of free public libraries in cities of the second and third classes." (Ky. Sts. 1909, sec. 3210b.) This last named Act contains an emergency clause, and took effect upon its approval by the Governor.

Chapter 65 authorizes the establishment and mainte-

nance of a public library, and the levy and collection annually of a tax not to exceed ten cents on each one hundred dollars of the assessed value of the property, subject to taxation; the appointment by the Mayor, with the approval of the council, of a board of five "directors" for the management of the library; it gives the board power to purchase and lease grounds and erect buildings for library purposes; to appoint a librarian; and, in general, to carry out the spirit and purpose of the Act, in establishing and maintaining a public library.

Section 9 further provides that, "any person desiring to make donations of money, personal property, or real estate for the benefit of such library shall have the right to vest the title of the property so donated in the board of directors created under this Act, to be held and controlled by such board, when accepted, according to the terms of the deed, gift, devise, or bequest of such property, and as to such property the said board shall be held and considered to be special trustees."

Chapter 70, containing the emergency clause, authorizes the establishment and maintenance of a public library, which shall be under the direction and control of a board of "trustees" consisting of seven members, to be styled the "Board of Trustees of the Public Library;" that said board of trustees shall be a body politic and corporate, under said name and style, with perpetual succession, and by that name may contract and be contracted with, sue and be sued, have and use a corporate seal, the same to alter and renew at pleasure, or it may act without a seal; may purchase, receive, lease, hold, sell and dispose of real and personal estate for public library purposes; that it shall have the custody, control, management and expenditure of all funds theretofore accumulated, or that might be thereafter accumulated for library purposes; that the Mayor of the city and the presiding judge of the county court, in case the county contributes annually to the maintenance of the library, shall be *ex officio* members of the board, and the remaining five members thereof shall be appointed by the Mayor; and that each member of the board shall give bond in the sum of $5,000.00 for the faithful performance of his duties. Said Chapter 70 contains this further provision:

"In aid of the establishment and maintenance of such library, there is hereby appropriated, and the general council shall annually direct to be paid over, as the

same may be collected, to the board of trustees of the public library, three per centum of the net amount of taxes levied annually in the city for common school purposes, and one-half of the net amount of all fines and costs collected in the police court; and to further aid in the establishment and maintenance of such public library, the general council of the city and the fiscal court of the county, either or both, jointly or separately, are hereby authorized and empowered to accept, by ordinance, resolution, order or contract (and if necessary, united with the board of trustees of the public library), any donation that may have been offered, or may hereafter be offered ⊦ Andrew Carnegie, or any other person, association or corporation, and comply with the conditions upon which said donations may be offered and accepted, and make the terms of said contract perpetually binding upon said city and county; and said general council of the city and fiscal court of the county shall annually levy such special tax as may be necessary to comply with said conditions or terms of contract, and to provide the sums of money agreed therein to be paid annually and perpetually for the maintenance of said public library, and shall cause the same to be collected as and when other taxes are collected and paid over promptly to the board of trustees of the public library.''

On November 18, 1903, Andrew Carnegie offered to give $30,000.00 for the erection of a public library building in Owensboro, provided a site for the building was secured and the council would pledge an annual appropriation of $3,000.00 for the support and maintenance of the library. By an ordinance approved December 5, 1903, the City of Owensboro formally accepted the Carnegie offer upon the conditions therein stipulated, and the Mayor appointed five trustees, who, with the Mayor, organized as the Board of Trustees of the Public Library of Owensboro, under Chapter 70 above referred to. A subsequent board of trustees raised, by popular subscription, the sum of $3,297.12 with which they contracted to purchase a site for the library building. In November, 1908, the board of trustees reported its action to the common council, which formally approved and ratified the act of the trustees in procuring the site for the library building; whereupon the trustees completed the purchase by paying the purchase price and procuring a deed dated December 2, 1908. Subsequently, in June, 1911, the board of trustees further reported to the com-

mon council that it had received Mr. Carnegie's donation of $30,000.00, with which it had erected a suitable library, building, at a cost of $26,000.00, and had expended the remaining $4,000.00 in furnishing and equipping said building. By a formal resolution, the council instructed its Finance Committee to inspect the building, and report, which it subsequently did, by reporting favorably to the council on July 3, 1911; whereupon that body, approved the report and directed the payment of the appropriation set apart for the maintenance of the library, out of the revenues for that year.

In the ordinance making the annual levy for the fiscal year beginning June 1, 1911, and ending May 31, 1912, a levy of $3,000.00 had been specifically made for the support and maintenance of the library for that year; and, in the levy ordinance for the year ending 1913, a similar specific levy was made.

In making the appropriation for the fiscal year ending May 31, 1912, the common council passed an ordinance which, after reciting the Carnegie gift, and the construction and completion of the library building, made the following appropriation:

"Section 1. That there be and there is hereby appropriated for the maintenance of the public library aforesaid, mentioned in the preamble to this ordinance, payable out of the general revenue of the City of Owensboro for the present fiscal year, the sum of Three Thousand ($3,000.00) Dollars; that said sum be paid to the 'Board of Trustees of the Public Library,' of the City of Owensboro, and that upon the final passage of this ordinance a warrant shall be drawn for said amount, in favor of said Board of Trustees on and payable by the City Treasurer of said city, signed by the city clerk and countersigned by the mayor, as in cases of other warrants drawn on and payable by said Treasurer.

"Section 2. That said sum of $3,000.00, mentioned in the first section of this ordinance shall be payable out of and charged to the account of the fund of $13,000.00 heretofore set apart 'for the payment of judgments against the city for damages, for costs and expenses in legal proceedings, for lands in opening streets, for covering deficiencies in appropriations, for the different departments, objects and purposes above specified in conducting the city government, and for all other incidental expenses not specifically provided for, and to pay the annual sum of Three Thousand ($3,000.00) Dollars to be

paid by the city for the maintenance of the Carnegie Public Library,' by ordinance heretofore passed, entitled 'An Ordinance concerning the taxes for the fiscal year commencing on the 1st day of June, 1911, and ending on the 31st day of May, 1913, and making a levy of ad valorem taxes and a poll tax in the City of Owensboro for the said fiscal year.' "

A similar ordinance was passed, appropriating a similar amount out of the general revenue fund for the fiscal year ending May 31, 1913. Warrants were duly drawn by the city clerk for the payment of the first appropriation of $3,000.00, and for the payment of one-half of the second appropriation which was then due, and the same were presented to the Mayor for his signature, as is required by ordinance. The Mayor refused to sign said warrants; whereupon the Board of Trustees of the Public Library of Owensboro, joining with it five of its trustees, brought this action for a writ of mandamus, requiring him to sign said warrants. The circuit court granted the prayer of the petition, requiring the Mayor to examine and countersign the said warrants, and deliver them, countersigned, to the plaintiff, on or before November 15, 1912; and from that judgment the Mayor prosecutes this appeal.

1. In the first place, it is insisted that the two Acts—Chapters 65 and 70—are so inconsistent, in so far as they relate to cities of the third class, as to render them void in that respect. It is a rule of interpretation that Acts of the same session of the legislature, and relating to the same subject, are to be read together, and are not to be construed as inconsistent if they can be fairly read otherwise. Nazareth L. & B. Inst. v. Commonwealth, 14 B. M., 266; Willson v. Hahn, 131 Ky., 444; Devous v. Gallatin County, 244 Ill., 40, 18 Ann. Cases, 422; Wright v. Tipton County, 82 Ind., 337; Smith v. People, 47 N. Y., 330; White v. Meadville, 177 Pa. St., 643, 34 L. R. A., 567; 36 Cyc. 1151.

In Peyton v. Moseley, 3 T. B. M., 77, the legislature, at the same session, had passed an Act requiring a bail bond to have a seal, and a further Act regulating civil proceedings which raised the dignity of unsealed instruments to an equality with sealed instruments.

In holdng a bail bond without a seal to be invalid, the court said:

"But with regard to acts of the same session, we apprehend that the rules of construction are somewhat

different. When they are compared together, they ought to be construed as one act on the same subject; and the presumption of so sudden a change or revolution in the minds of the Legislature, ought not to be indulged. There ought to be an express repeal, or an absolute inconsistency between the two provisions, to authorize a court to say that the latter had repealed the former. If both these provisions were in the same act, both must have effect if possible.''

In 36 Cyc., 1151, the rule of construction in such cases is announced as follows:

"The rule that statutes *in pari materia* should be construed together applies with peculiar force to statutes passed at the same session of the legislature; it is to be presumed that such acts are imbued with the same spirit and actuated by the same policy, and they are to be construed together as if parts of the same act. They should be so construed, if possible, as to harmonize, and force and effect should be given to the provisions of each; if, however, they are necessarily inconsistent, a statute which deals with the common subject-matter in a minute and particular way will prevail over one of a more general nature; and of two inconsistent statutes enacted at the same session, that will prevail which takes effect at the later date.''

The rule requiring the two acts of the same session to be read together as if parts of the same act, if it can be done, is especially applicable if the two acts were passed or approved on the same day, as here. Territory v. Wingfield, 2 Ariz., 305, 15 Pac., 139; People v. Jackson, 30 Cali., 427; Chandler v. Lee, 1 Idaho, 349; Manuel v. Manuel, 13 Ohio St., 458; Stuart v. Chapman, 104 Me., 17.

In Princeton Coal Mining Co. v. Lawrence, ——, Ind., ——, 95 N. E. 423, two acts of the Legislature were passed on the same day; one, by its terms, being cumulative of other laws upon the subject of coal mining, and repealing inconsistent laws, while the other, with an emergency clause, embraced the subject of actions for injuries, by classifying them. In upholding both acts, the court said:

"The rule is general that all consistent statutes which can stand together, as related to the same subject, shall be construed together, and with reference to the whole system of which they form a part, and harmonized and effect given to all, if this can be consistently done, so as to make the law consistent in all its parts and uni-

form in its application and results, and the intent as collected from an examination of the whole, and all its parts will prevail over the literal import of particular terms, and control the strict letter of such terms, when the latter would lead to injustice, and contradictions. State v. Bergoff, 158 Ind., 349, 353, 63 N. E. 717; Lime City Co. v. Black, 136 Ind., 544, 35 N. E., 829; Haggerty v. Wagner, 148 Ind., 625, 48 N. E., 366, 39 L. R. A., 384; State v. Wilson, 142 Ind., 102, 107, 41 N. E., 361; U. S., etc., Co. v. Harris, 142 Ind., 226, 231, 40 N. E., 1072, 41 N. E., 451; Sutherland, Statutory Construction, Sec. 443.

"Even in case of acts passed at the same session, but on different days, it is to be presumed that all are in the mind of the Legislature, and, when related to the same subject, that they are imbued with the same spirit and actuated by the same policy, and are to be construed that all may, if possible, stand. Conn. v. Board, 151 Ind., 517, 51 N. E., 1062; Shea v. Muncie, 148 Ind., 14, 46 N. E., 138; Houston, etc., Co. v. State, 95 Tex., 507, 68 S. W., 777; Harris v. State, 96 Tenn., 496, 34 S. W., 1017; Board v. People, 49 Ill. App., 369; MacVeagh v. Royston, 71 Ill. App., 617; Cincinnati v. Connor, 55 Ohio St., 82, 44 N. E., 582; Illinois, etc., Co. v. Pearson, 140 Ill., 423, 31 N. E., 400, 16 L. R. A., 429. This is more true where acts are passed on the same day. Commonwealth v. Huntley, 156 Mass., 236, 30 N. E., 1127, 15 L. R. A., 839; Solomon v. City of Denver, 12 Colo. App., 179, 55 Pac. 199; Territory v. Wingfield, 2 Ariz., 305, 15 Pac., 159; Lien v. County, 80 Minn., 58, 82 N. W., 1094.

"The fact that the act is declared to be cumulative is also of great force in evincing the legislative intent."

In Austin v. G. C. & S. F. R. R. Co., 45 Tex., 266, the court said:

"Under the general rule of statutory construction, laws relating to the same subject, enacted during the same session of the Legislature, are to be construed together, and are ordinarily to be taken as parts of the same act. These acts were not only passed at the same session of the Legislature, but on the same day, and relate to the same act, passed likewise at an earlier day of the same session of the Legislature. They are identical in every respect, except that the excepting clause in the one is somewhat broader than in the other. Unquestionably these acts must be construed together, and effect given to their entire provisions, if they are not in direct conflict; and if so, they would then neutralize each other.

But it cannot be said, because the exceptions in the one are broader and more enlarged than in the other, that there is any such conflict between them.''

In Dobbins v. Board of Supervisors of Yuba County, 5 Cali., 415, the rule was applied as follows:

"On the 1st of May, 1851, two Acts were passed by the Legislature; one, an Act to regulate Proceedings in Criminal cases; the other, an Act to regulate Fees in Office. Both Acts fix the fees of the Clerk of the Court in criminal cases, and the two are essentially different in their provisions.

"In this dilemma, the latter Act must govern, from the time it went into effect, May 1, 1852. The subject of fees was the sole object of that Act, and consequently the inference deducible is, that the attention of the Legislature was more particularly directed to establishing the correct rates of fees than it was in the first-mentioned Act—the main object of which was to regulate criminal proceedings, and to which the fixing of Clerk's fees was a slight incident, easy to be overlooked, and disregarded; especially when we reflect upon the length, importance, and subject matter of the Act.''

And, in so far as two such acts are irreconcilable, the act which is approved latest supersedes the earlier act, and is to be treated as the expression of the legislative will upon the subject. Sweeney v. Ft. Wayne, etc., R. R. Co., 59 Ind., 205; Wright v. Tipton County, 82 Ind., 335; Gibbons v. Brittenum, 56 Miss., 249; Garrison v. Richards (Tex.), 107 S. W., 861.

It has been held that in determining which of two inconsistent acts, enacted at the same time, is the latest expression of the legislative will, the last in order of arrangement prevails; but that this rule is to be applied only after exhausting every other effort at construction. State v. Williams, 8 Ind., 192.

But above these subordinate principles of construction there arises the cardinal principle of statutory construction that it is the duty of courts to execute laws according to their true intent and meaning, which is to be collected from the whole and every part of the statute taken together; and, when so collected, it must prevail even over the literal sense of the terms, and control the strict letter of the act where the letter would lead to possible injustice, contradiction, and absurdity. Chandler v. Lee, supra; Stuart v. Chapman, supra.

If, therefore, there are any facts connected with the

passage of these two acts, when considered in their entire history, that would indicate which act expresses the mind of the Legislature concerning the common subject to which they relate, those facts must be given controlling force; and it is contended that the emergency clause in Chapter 70 should and must be given that force.

Heilig v. City Council of Puyallup, 7 Wash., 29, 34 Pac., 164, is directly in point. In that case the court said:

"The main question in this case is, whether the members of the city council of Puyallup, which is a city of the third class, shall be paid for sitting as a board of equalization in the month of May. The act of March 9, 1893 (Laws, p. 157), amending the act of 1890 providing for the organization of municipal corporations of the second, third and fourth classes, amended section 133 of the act of 1890 (Laws, p. 192) by imposing upon the city clerk the duties of city assessor and abolishing the office of city assessor entirely. Another act (Laws 1893, p. 171), approved the same day, provided for the assessment of property in cities of the third and fourth classes by the county assessor. The first of these two acts passed the House February 24th, and the Senate March 2, 1893; the latter act passed the House March 3rd, and the Senate March 8th. The former act was without an emergency clause, and went into effect June 7th; the latter act contained an emergency clause, and went into effect immediately upon its approval by the Governor.

The effect of the latter act is, that the council could not sit as a board of equalization. The court below, taking the view that the second act should prevail, prohibited the members of the council from acting as such board of equalization, and receiving pay therefor. We agree with this disposition of the case. Whether in pursuance of the second act the first one would have any force after the 7th of June, might be a question for discussion, but the fact is that at the time the council proposed to sit as a board of equalization in the month of May the second act was the law of the state, and the judgment was right. But we are also of the opinion that where two conflicting acts upon the same subject matter are passed at the same session of the legislature, and their conflict is such that they cannot be harmonized and stand together, and one of them contains an emergency clause and the other does not, that one containing the emergency clause must be taken to

overcome the other. The simple fact of there being an emergency clause would tend to show that the subject matter of the act was more clearly and pointedly before the legislature than the subject matter of the other act. In this case the second act has the additional argument in its favor that it was actually passed by both houses of the legislature after the first one."

In the case at bar, however, the legislative history of the two acts does not aid us, since Chapter 65, being Senate Bill No. 8, passed the Senate on March 12, and the House on March 18, while Chapter 70, being House Bill No. 341, passed both House and Senate on March 13. Chapter 65 was signed by both Speakers on March 18th; while Chapter 70 was signed on that day by the Speaker of the Senate, and on the 17th by the Speaker of the House.

We think the view taken by the Supreme Court of Washington is sound, and that the emergency clause in Chapter 70 denotes and shows that the subject-matter of that Act was more clearly and thoroughly considered by the Legislature than the subject-matter of Chapter 65; and that in so far as the two acts conflict in their creation and control of libraries for cities of the third class, Chapter 70 must prevail. It is plain, moreover, that the two acts are so inconsistent in their creative and administrative features as to be incapable of a joint operation. One or the other must control. See, also, Meade v. Bagnall, 15 Wisc., 156; Hill v. Mitchell, 5 Ark., 614; Board of Health v. Schmedes, 10 Abbott. Pr. (N. Y. 205.)

As heretofore pointed out, Chapter 65 makes the governing body a board of five directors, while Chapter 70 calls it a board of trustees of seven members. Both sets of officers are appointed by the Mayor; and while the mere fact that the council is required to approve them in one case, and not in the other, and that under Chapter 70 each trustee is required to give a bond in the sum of $5,000.00, while no bond is required of the directors under Chapter 65, might not constitute a material difference in the powers of the members of the governing board, it is clear the governing body must consist of either five or seven members, and that in this respect one act, and not both, must control.

Furthermore, Chapter 65 provides for the levy of an *ad valorem* tax not to exceed ten cents on the hundred

dollars of the assessed property to support the library, while chapter 70, (omitting therefrom as we must under the authority of the Covington case, 113 Ky., 234, as unconstitutional the special provision concerning the school tax), provides for the levy of such special tax as may be necessary to support the library.

We conclude that the rule announced in Heilig v. City Council of Puyallup is the law of this case; and that chapter 70, which, by reason of its emergency clause, first took effect, contains the law upon this subject, and repeals chapter 65, in so far only as it relates to libraries for cities of the third class.

2. It is insisted, however, that chapter 70 is unconstitutional and void, as violating section 179 of the constitution, which prohibits the General Assembly from authorizing any city to appropriate money for any corporation, association or individual, except for the purpose of constructing or maintaining bridges, turnpike roads or gravel roads. This objection rests upon the contention that the appellee is a private corporation, and that under the prohibition of section 179 above referred to, the act authorizing the city of Owensboro to turn over to the appellee, for library purposes, money raised by taxation, was wholly unauthorized. But, certainly, appellee is not a private corporation. The difference between public and private corporations is pointed out by Thompson on Corporations, sec. 21, as follows:

"The importance of the distinction between the two is emphasized by the fact that many principles and rules which apply to one have no application to the other. Thus a public corporation is subject to legislative control without any reference to the consent of the persons who control it. A public corporation does not originate in contract, while a private corporation does, and therefore the instrument creating the latter cannot be altered or amended by the lawmaking power, without the consent of the members who compose it, unless such power is expressly reserved. Public corporations are mere creatures or instrumentalities of the state and are subject to governmental visitation and control. So, the property of a public corporation is not taxable, while that of a private corporation is. A public corporation is, generally, political in its nature, and its object is to carry out a scheme of government, while a private corporation has none of these characteristics."

And, in Morawitz on Private Corporations, sec. 3, it is said:

"Public corporations are not voluntary associations at all, and there is no contractual relation between the corporators who compose them; they are merely government institutions, created by law, for the administration of the public affairs of the community."

A corporation created under a general law, for the management of a public library supported by taxation, is in no sense a private corporation; it is a public corporation, existing at the will of the Legislature.

And, although the question now raised seems not to have been heretofore suggested, it was incidentally, if not necessarily passed upon in Board of Education of Covington v. Board of Trustees of Public Library of Covington, 113 Ky., 234, and in Ramsey v. City of Shelbyville, 119 Ky., 180.

3. It is further contended that the provision of chapter 70, which appropriates for library purposes, three per centum of the net amount raised for common school purposes, as hereinbefore set out, violates section 180 of the Constitution, which requires that every ordinance which levies a tax shall specify the purpose for which the tax is levied, and that it cannot be used for any other purpose. Unquestionably this objection is sound; and so much of chapter 70 as would divert the school fund is unconstitutional. Board of Education of Covington v. Board of Trustees of Public Library of Covington, 113 Ky., 234. But, since the appropriation, which is the subject of this action, is not derived from the school tax, the objection is without effect. The money in controversy was specifically provided for in the general levy, for each year, for the support of the library; and, under the provisions of chapter 70, the general council had the authority to make such an annual levy, and cause the same to be collected, as and when other taxes are collected and paid.

4. Finally, it is insisted that the provision in chapter 70, that requires the general council to annually and perpetually levy such a special tax as may be necessary to comply with the conditions of the Carnegie gift, is in conflict with section 157 of the Constitution, which provides, among other things, that no city shall be authorized to become indebted, to an amount exceeding, in any year, the income and revenue provided for such

year, without the assent of two-thirds of the voters thereof voting at an election to be held for that purpose. The precise question now suggested was decided according to appellant's contention in Ramsey v. City of Shelbyville, 119 Ky., 180; but, in the response to a petition for a rehearing, the court further said:

"There is nothing in the opinion to suggest the illegality of any appropriation made by the council of Shelbyville out of the annual revenue for the benefit of the public library. On the contrary, so far as this record shows, and as we are at present advised, such action, if any, was entirely valid."

In the case at bar the appropriation was specifically made out of each year's revenues; and this, the general council had ample authority to do.

Judgment affirmed.