[File No. 6196.]

O. J. BRYE, John Holven, Sophie Anderson, Peter J. Egeland, Julius Rosendahl and K. C. Kopseng, Appellants, v. ALFRED S. DALE, State Treasurer, and Berta Baker, State Auditor, of the State of North Dakota, Respondents.

(250 N. W. 99.)

42

Opinion filed September 19, 1933.

*W. E. Matthaei,* for appellants.

*A. J. Gronna,* Attorney General, and *Harold Shaft,* Assistant Attorney General, for respondent.

BURKE, J. In 1933 the legislature enacted Chapter 64 of the Session Laws of 1933. Section 1 reads as follows: "There is hereby transferred into and loaned to the Real Estate Bond Interest Payment Fund established and created by Chapter 182 Laws of 1929, from the Permanent Hail Surplus Fund established and created by Chapter 189b6 Supplement to the 1913 Compiled Laws of North Dakota, the

sum of five hundred thousand ($500,000.00) dollars to be used in the payment of interest now due or to become due on said bonds. The said sum of five hundred thousand ($500,000.00) dollars to be transferred and paid back to the Permanent Hail Surplus Fund on or before January 1, 1939, with interest at the rate of two per cent (2%) per annum out of any funds available in the said bond interest payment fund."

The petitioners brought this action to enjoin the transfer of the said $500,000.00, claiming that chapter 64 of the Laws of 1933 violates § 175 of the Constitution, which provides that "No tax shall be levied except in pursuance of law, and every law imposing a tax shall state distinctly the object of the same, to which only it shall be applied;" that it violates article 24 of the amendments to the Constitution namely: "The legislative assembly may by law provide for the levy of a tax upon such lands as may be provided by law of the state for the purpose of creating a fund to insure the owners of growing crops against losses by hail; provided, that such tax shall not affect the tax of four mills levied by the Constitution. The legislative assembly may classify such lands of the state as may be provided by law, and divide the state into districts on such basis as shall seem just and necessary and may vary the tax rate in such districts in accordance with the risk, in order to secure an equitable distribution of the burden of such tax among the owners of such land as may be provided by law;" and § 177 of the Constitution which provides that "The legislature may by law provide for the levy and collection of an acreage tax on lands within the state in addition to the limitation specified in § 174 in article 11 of the Constitution. The proceeds of such tax shall be used to indemnify the owners of growing crops against damages by hail, provided that lands used exclusively for public roads, rights of way of common carriers, mining, manufacturing or pasturage, may be exempt from such tax." Both amendments to the Constitution were approved and adopted at the general election held November 5th, 1918. From an order sustaining a demurrer the petitioners appeal.

In the case of Davis v. McLean County, 52 N. D. 857, 204 N. W. 459, this court said: "The first amendment authorizes the legislative assembly to provide by law 'for the levy of a tax upon such lands as may be provided by law of the State for the purpose of creating a fund to insure the owners of growing crops against losses by hail.' The sec-

ond amendment provides that the 'legislature may by law provide for the levy and collection of an acreage tax on lands within the state,' the proceeds of which 'tax shall be used to indemnify the owners of growing crops against damages by hail.' " In that case the court did not attempt to point out any difference between the two amendments and while both amendments authorized the taxing of land for the payment of losses by hail, it is clear, from the text and from the fact that both were adopted at the same election, that there is a difference. The purpose of the first amendment is to create a fund to insure the payment of losses by hail.

Under this provision the legislature has full authority to provide whatever insurance fund is necessary without any constitutional limitation and under the other amendment, adopted at the same time, may provide for a levy of an acreage tax on land, also without constitutional limitation, the proceeds of such tax to be used to indemnify the owners of growing crops against damages by hail.

In 1921 the legislature enacted chapter 77 of the Laws of 1921, § 6 of this law reads as follows: "There is hereby levied for the years 1921, 1922, 1923, 1924, 1925 upon each and every acre of tillable land in the State, a flat tax of three cents per annum for the purpose of carrying out the provisions of this Act, and creating a permanent surplus in the Hail Insurance Fund to be applied in paying losses more promptly. . . . All moneys collected under the provisions of this section shall be paid into the State Hail Insurance Fund but a separate record of such moneys shall be kept by the county and state treasurers."

Section 7 of the Laws of 1921 reads as follows: "The Commissioner of Insurance shall on or before the twenty-fifth of October of each year ascertain the amount which is required for the total payment of all loss caused by hail to crops insured by the department and a sum sufficient to pay interest at the rate of six per cent on all warrants issued from the first of December until called for payment by the State Treasurer plus a sufficient sum to maintain and operate the department for the succeeding year, and shall thereupon for the purpose of securing and paying the same levy an indemnity acreage tax sufficient to cover said amount on all cropped land insured (except hay and meadow land) not withdrawn from the operation of this Act as hereinafter specified, provided that the total amount of said indemnity tax shall not exceed

in any one year the sum of fifty cents per acre for seven dollars indemnity or seventy one cents per acre for ten dollars indemnity. Provided further that if the sum collected by the maximum levy should be insufficient to pay all losses in any one year, the payment of losses shall be prorated. All moneys collected under the provisions of this Section shall be paid into the State Hail Insurance Fund."

This latter section provides for the levy and collection of taxes annually to indemnify loss by hail, while § 6 of the act creates the insurance fund, or as it is called, a Permanent Surplus Hail Insurance Fund to insure the payment of losses more promptly, and was only for the years 1921, 1922, 1923, 1924 and 1925.

Section 6 of the Act of 1921 provides that "all moneys collected under the provisions of this Section shall be paid into the State Hail Insurance Fund but a separate record of such moneys shall be kept by the County and State treasurers." Under this section each county has a record of the taxes collected in the county, which goes into the insurance fund and the state treasurer has a separate record of all taxes collected in all the counties for such insurance fund. Section 7 provides that "all moneys collected under the provisions of this section (§ 7) shall be paid into the State Hail Insurance Fund" without specifying anything about a record and while it appears that the funds collected under § 6 and § 7 are paid into the State Hail Insurance Fund, there is a separate record kept of the collection made under section 6 which shows how much money there is in that fund at all times and it is out of this insurance fund that the $500,000.00 is transferred to the fund for the payment of interest on bonds. If this is a diversion, it is unconstitutional under §§ 175 and 177 of the Constitution and article 24 of the constitutional amendments. Article 24 authorizes the levy of a tax for the purpose of creating a fund to insure the owners of growing crops against losses by hail. It is stated specifically in article 24 and § 177 of the Constitution how taxes so raised shall be applied and certainly the legislature did not have authority to use it for any purpose except the purpose specifically mentioned in the Constitution, namely: the creating of a fund to insure against losses by hail. A fund created under these provisions of the Constitution is beyond the power of the legislature to use in any way except as authorized in the Constitution.

The Michigan Constitution directs that every law imposing a tax shall specify the object to which it is to be applied but where the application of the tax is distinctly made by the Constitution it cannot be altered by the legislature. Walcott v. People, 17 Mich. 68.

In the case of Goer v. Taylor, 51 N. D. 792, 200 N. W. 898, at page 798, the court having under consideration the statute requiring attorneys to pay a license fee of $15.00 said: "Such charge may be imposed either for the purpose of producing revenue, in which case, as a tax, it is subject to the requirements of § 175 of the Constitution (see State v. Klectzen, 8 N. D. 286, 78 N. W. 984 . . . .").

In Opinion of Judges, 59 S. D. 469, 240 N. W. 600, the South Dakota court said: "Secondly, and with particular reference to the possibility of employing moneys (either state or county) now on hand or to accrue under present levies, for the furnishing of feed or making of feed loans, article 11, § 8, Constitution of this state, provides: 'No tax shall be levied except in pursuance of a law, which shall distinctly state the object of the same, to which the tax only shall be applied.' Under this section we are of the opinion that moneys now on hand (or hereafter to be received) as the result of payment of taxes (whether motor vehicle, fuel tax or other tax) already levied, and the proceeds of which have already been appropriated, must be applied to the purposes for which they were levied and to which they have already been appropriated, and we think the same could not now be diverted, even by legislative action, to any other purpose. See Opinion of Judges, 50 S. D. 324, 210 N. W. 186; White Eagle Oil & Ref. Co. v. Gunderson, 48 S. D. 608, 205 N. W. 614, 43 A.L.R. 397."

In White Eagle Oil & Ref. Co. v. Gunderson, supra, the court held that chapter 184 of the Laws of 1925 authorizing the state to invest motor fuel tax funds, levied and appropriated for highway purposes, under Laws 1923, c. 225, as amended by Laws 1925, chaps. 228, 229, in gasoline, oils, etc., for sale at retail, violates Const. art. 11, § 8, prohibiting use of taxes raised and appropriated for special purpose for another purpose, whether object be exercise of police power to control and regulate dealing in gasoline for private purpose.

Cooley on Taxation, § 1818, states the rule as follows: "The constitution in some states expressly provides that no tax shall be levied except by an act which shall distinctly state the object of the same, to

which object only shall such tax be applied." Kansas City v. Stewart, 90 Kan. 846, 136 Pac. 241; National Bank v. Barber, 24 Kan. 534; Lambert v. Public Library, 151 Ky. 725, 152 S. W. 802, Ann. Cas. 1915A, 180.

61 C. J. page 98, § 26, states the rule as follows: "It is sometimes provided by constitution that every law which imposes, continues, or revives a tax shall distinctly state the tax and the object to which it is to be applied; . . . Such provisions have been held to be mandatory and all tax statutes must comply therewith." Citing Kansas, Kentucky, Michigan, Missouri, New York, North Dakota, Ohio, Oklahoma, Oregon, South Carolina, Washington and Wyoming. See Cooley on Taxation, pages 3569, 3570.

If the disposition of the revenue is fixed by the Constitution or by a statutory law, it is beyond the power of the legislature to divert the fund. There is no question but what a plain diversion of the fund would be a violation of the Constitution, but it is the contention of the respondent that under the act of 1933 the transfer of the fund is a loan. It states "There is hereby transferred into and loaned to the Real Estate Bond Interest Payment Fund established and created by chapter 182, Laws of 1929, from the Permanent Hail Surplus Fund . . . five hundred thousand ($500,000.00) dollars to be used in the payment of interest now due or to become due on said bonds. The said sum of five hundred thousand ($500,000.00) dollars to be transferred and paid back to the Permanent Hail Surplus Fund on or before January 1, 1939, with interest at the rate of two per cent (2%) per annum out of any funds available in the said bond interest payment fund."

It is the intention of this act to take the fund that was raised, under the Constitution, to insure against losses by hail and use it for an entirely different purpose for nearly six years and the sole question in the case is, can this fund be so used as provided in the law?

In the case of Griffin v. Tacoma, 49 Wash. 524, 95 Pac. 1107, at page 1109, the court said that the charter provision of the City of Tacoma provides that "all funds raised by a vote of the people or by special taxation, or in any other manner for a special purpose, shall be used for that purpose, and none other. No fund shall be diverted from the purpose for which it was originally assessed or collected or voted by the people without the proposition therefor is submitted to a vote

of the people and authorized by at least a majority vote. . . . It will be seen that the charter provision first deals with the subject of special funds provided by law, and requires that moneys which have been collected by taxation for such special funds shall remain therein. It is not provided that moneys which have been collected for the general fund for general municipal purposes may never in the interest of expediting the city's business be temporarily transferred to a special fund; but it is provided that no fund shall ever be diverted from the purpose for which it was originally collected. The word 'diverted' is used in the sense of turning permanently from its purpose, the equivalent of appropriation for some other use. A temporary transfer from the general fund to another fund with an assured income is not an appropriation or diversion. With its outstanding credit against the other fund, the assets of the general fund remain the same, and its power to accomplish municipal purposes has not been decreased. The city controls both funds, and it is under the legal obligation to see that the general fund is seasonably reimbursed from the source of supply to the special one. Of course, the city authorities must exercise common business sense in making such transfer." In this case the transfer was made out of the general fund to the special fund. The court says: "The charter provision first deals with the subject of special funds provided by law, and requires that the moneys which have been collected by taxation for such special funds shall remain therein," and then it continues "It is not provided that moneys which have been collected for the general fund for general municipal purposes may never in the interest of expediting the city's business be temporarily transferred to a special fund." In other words, because there was no provision in the charter preventing the temporary transfer of funds from the general fund it may be done; but since the law provides that the tax collected for such special fund shall remain therein the transfer could not be made from the special fund to any other fund.

In the instant case the fund to insure against losses by hail is a special fund provided for in the Constitution itself.

A very late case is the Illinois case of Gates v. Sweitzer, 347 Ill. 353, 179 N. E. at page 840, 79 A.L.R. 1151, the court said: "Municipal officers have no right to divert moneys from one fund to another and different fund for which it was not appropriated. But the word 'divert'

is used in the sense of turning such fund permanently from its purpose or the final appropriation of it to some other use. If, as counsel for appellees argue, the commissioners had a right to, and did, temporarily borrow sufficient idle bond funds or other funds for the benefit of a fund having a stated and sufficient income to re-pay the sum borrowed, as the bond fund had, and with the intention that it shall be so re-paid, such is not a diversion of funds, for the fund from which the money is taken holds the credit against bond interest and principal fund as is not depleted. Section 12 of article 9 of the Constitution provides that any municipal corporation incurring bonded indebtedness, 'shall before, or at the time of so doing, provide for the collection of a direct annual tax sufficient to pay the interest on such debt as it falls due, and also to pay and discharge the principal thereof within twenty years from the time of contracting the same.' It will be observed that this provision of the Constitution contemplates, not only the levy of taxes sufficient to meet the interest and principal payment on bonds, but likewise requires the collection of taxes in such amounts. This provision of the Constitution is mandatory and self-executing. No supplemental legislation is necessary to make it effective. . . . Liabilities against municipalities accruing during the year for which the levy is made, frequently must, in order to preserve the credit of the municipality, be paid prior to the collection of the tax, and it is the duty of the officers in charge of the levy and collection of taxes to use sound-business judgment that the credit of the municipality be not impaired."

In this case, like the Washington case, the loan was only temporary for the benefit of a fund having a stated and sufficient income to repay the sum borrowed.

In the case of People ex rel. Merchants' Sav. Loan & T. Co. v. Auditor, 30 Ill. 434, the Illinois court had under consideration a statute very much like the statute in the instant case, at page 438 the court said: "The second section provides that all funds now in the State treasury, belonging to the State, except the interest fund and the school fund, and the Central Railroad fund, shall be loaned and transferred by the State Treasurer upon the auditor's warrant, to be drawn for that purpose, to the revenue fund; and all funds hereafter received into

the State treasury and belonging to the State, except the said interest fund, and the said school fund, and said Central Railroad fund, shall be paid to the said revenue fund; and said funds shall be subject to be drawn therefrom upon the auditor's warrants, issued for the payment of appropriations made by law." The statute in the instant case states that "There is hereby transferred into and loaned to" and in the Illinois case the statute says "shall be loaned and transferred," both statutes having the same meaning. The court in referring to the law on page 440 says "For what does it provide? For nothing less than the utter perversion of this fund, to purposes never contemplated by the people who established it, in disregard of their wishes, and in violation of the rights of its beneficiaries. However honest may have been the motives of the legislature—and we do not question them—however praiseworthy may be the desire to relieve the people of a heavy, and apparently, an unnecessary tax, and however obligatory it may be so to legislate, the injunction of the constitution should be a consideration above all of them."

It is true that there is no express provision in this law for the paying back of the fund as there is in the law in the instant case, but if it was a loan, payment is implied. There is no provision in the law in the instant case for the repayment except out of funds in the Bond Interest Payment Fund and that fund is not available until all the bonds and interest are paid.

The language in the statute, namely: "The said sum of five hundred thousand ($500,000.00) dollars to be transferred and paid back to the Permanent Hail Surplus Fund on or before January 1, 1939" does not require the repayment of the fund until the expiration of the entire period of the loan. There is no provision in the law under which the officials charged with the duty of disbursing the hail insurance fund could compel the payment before January 1, 1939, a period of nearly six years, and it could only be paid then, if at all, out of available funds in the Bond Interest Payment Fund. If there were no funds available in the Bond Interest Payment Fund on January 1, 1939 it could not be paid then. Would the bond interest fund ever be available for such purpose?

Section 2290c7, Supplement to the Compiled Laws, 1913, as amend-

ed by Chapter 182 of the Laws of 1929 provides that the state treasurer shall use the proceeds of mortgage obligations "first, for the security and payment of bonds to be issued . . . ; and second, for re-delivery to The Bank of North Dakota for such remaining part or balance thereof as may come within the provisions (of the act). He shall segregate such moneys into separate funds designated as follows: First, 'Real Estate Bond Sinking Fund,' and in this fund he shall place all sums collected for the purpose of retiring the principal of said bonds at the maturity of the same; second, 'Real Estate Bond Interest Payment Fund,' and into this fund he shall place all moneys collected for the purpose of paying interest on said bonds, except the administration fee of one-half of one per cent to be paid to The Bank of North Dakota as provided in this act. All principal payments made on notes and mortgages securing the same shall be placed in the Real Estate Bond Sinking Fund, and all interest payments made on notes and mortgages securing the same shall be placed in the Real Estate Bond Interest Payment Fund. Such funds shall not be intermingled and no payment shall be made out of either of such funds except for the purpose for which they are created, except as provided in this act. Such funds shall be kept apart from all funds in his possession. He shall also keep in said funds as a part thereof for the same purpose, the same manner and under the same limitations, and conditions, all moneys received by him whether from the proceeds of taxes or from payments made by the industrial commission or from legislative appropriations or otherwise, which shall by law or other authoritative designation made applicable to the payment of the principal of said bonds or to the interest thereon. The state treasurer shall, with the approval of the industrial commission of the State of North Dakota, invest the funds before designated as Real Estate Sinking Funds; in approved United States Government, state bonds, or certificates of indebtedness of the State of North Dakota, or municipal bonds, as provided; that at the request of the industrial commission, the state treasurer shall redeem and take up out of said real estate bond sinking funds any of the Series 'A', 'B', or 'C' Real Estate Bonds outstanding which may be called by the industrial commission; . . . *No other disposition, appropriation, or otherwise, shall ever be made of the money in said*

52

*funds until said bonds shall be fully paid; or until the time limit provided by law for the payment thereof shall have expired."*

The fund, for the payment of the bonds, is definitely and permanently tied up and can be applied only for the payment of bonds. It can only be invested in government and municipal bonds and certificates of indebtedness. Certainly no part of this fund or the interest fund could be loaned to any other fund, no matter how much money was in the funds or how idle they were. They must be kept in separate funds as provided, so that there will always be in the interest fund moneys for the payment of interest and in the sinking fund, moneys for the payment of bonds when they are due. As stated in § 2290c12, as amended by chapter 182, Laws of 1929, "It being the intent and purpose of this act that at all times both of said funds shall have sufficient moneys on hand to meet all payments of principal and interest when the same become due, and to make it mandatory upon the industrial commission to recommend and the state board of equalization to make annual levies when necessary in order that both of such funds shall be kept in such condition that the interest payments on North Dakota Bonds, Real Estate Series, shall be promptly paid out of funds collected or levied for interest payments only and that each year the sinking fund created for the purpose of retiring such bonds shall be proportionately increased so that this fund shall at all times during the life of said bonds be solvent and have in it the proper amount, taking into consideration the number of years before the due date of said bonds."

These provisions are not amended or repealed by the act transferring funds from the Hail Surplus Fund to the Bond Interest Payment Fund. The law does provide for the investment of the sinking funds in bonds and certificates of indebtedness but ordinarily such bonds and certificates of indebtedness are the same as cash and can be converted into money. They always have a fixed price on the market which is very seldom below the par value. While this fund may be invested it is clear that the fund cannot be invested except as provided by law.

Likewise the provisions in the Constitution and the statutes authorizing a tax upon land to create a fund to insure the payment of losses by hail, limit the use of the fund so raised to the purpose named in the Constitution, viz.: to insure the owners of growing crops against losses by hail. This fund is raised by a tax, a constitutional tax. It is a

constitutional fund appropriated for a specific purpose and can be used in no other way. The appropriation, or the loaning, of the fund for any other purpose would violate said article 24, § 177 of the Constitution, and § 175 of the Constitution which provides that every law imposing a tax shall state distinctly the object of the same to which only it shall be applied.

In 1933 the legislature, by chapter 249 of the Session Laws of that year, provided that "There shall be levied upon each dollar of assessed valuation of all taxable property within this state for the year 1933, to be paid during said year, one-half of one mill and all such revenues that may be collected thereby, shall be paid into the state treasury and there kept in a special fund to be known as the North Dakota Real Estate Bond Fund, which shall be used for the following and no other purposes: To pay the interest on North Dakota Real Estate Bonds outstanding and the balance if any, to make up the deficiency in the sinking fund provided for by law for North Dakota Real Estate Bonds. Provided that whenever there is sufficient money in said fund or otherwise to fully pay said sums as hereinbefore provided then the said levy shall cease and any monies remaining therein shall be turned over to the general fund." This law passed by the same legislature, in aid of the bond and interest fund, with no provision for the payment of the loan and providing that moneys remaining in the fund shall be turned over to the general fund, indicates that the loan was not intended as a temporary loan.

Section 182 of the Constitution provides that "every law authorizing a bond issue shall provide for levying an annual tax, or make other provision, sufficient to pay the interest semi-annually, and the principal within thirty years from the date of the issue of such bonds, and shall specially appropriate the proceeds of such tax, or of such other provisions to the payment of said principal and interest, and such appropriation shall not be repealed nor the tax or other provisions discontinued until such debt, both principal and interest, shall have been paid." This provision in the Constitution authorizes the enactment of legislation to provide funds for the payment of bonds and interest thereon and the enactment of §§ 2290c7 and 2290c12 Supplement to the Compiled Laws, 1913, as amended by chapter 182 of the Session Laws of 1929, is a compliance therewith. Under the Constitution and

the statutes the bond and interest funds are available only for the payment of the bonds and the interest thereon.

However, § 189b23 of the Supplement to the Compiled Laws, 1913, as amended by chapter 170 of the Laws of 1931 provides "All moneys collected under the provisions of the State Hail Insurance Law shall be turned over to the State Treasurer and shall be kept in a separate fund to be designated 'State Hail Insurance Fund.' Provided, that a sufficient amount shall at all times be retained in the State Hail Insurance Fund to meet the current expenses of the State Hail Insurance Department as certified by the Commissioner of Insurance, and all the expenses of conducting the Department and the payment of all losses provided for under the provisions of this act shall be paid out of such fund as hereinbefore or hereinafter provided, and all of said moneys so collected are hereby appropriated for the purpose of carrying out the provisions of the hail insurance law. . . . The State Treasurer shall deposit such moneys in the depository bank designated by law for state funds except that with the assistance and approval of the Commissioner of Insurance part of such funds may be invested in bonds or certificates of indebtedness issued by the State of North Dakota, and such securities shall have the approval of the Attorney General as to the form and legality thereof." Under this law there must be retained in the State Hail Insurance Fund a sufficient amount to meet the current expenses of the State Hail Insurance Department as certified by the Commissioner of Insurance and all expenses and losses and all moneys in the fund over and above the amount necessary to meet the current expenses and losses may be invested by the state treasurer in bonds or certificates of indebtedness issued by the state of North Dakota, with the assistance and approval of the Commissioner of Insurance, the form and legality thereof to be approved by the attorney general.

Under § 2290c12, as amended by chapter 182 of the session laws of 1929 "if there are not sufficient funds in the real estate bond interest fund to meet the payment of interest due on real estate series bonds on any interest payment date, the state treasurer is authorized to borrow sufficient funds by the issuance of certificates of indebtedness of the state of North Dakota, to make such payment." Thus certificates of indebtedness may be sold when necessary to replenish funds for the

payment of interest and under § 189b23, Supplement to the Compiled Laws, 1913, as amended by chapter 170 of the Session Laws of 1931, the certificates of indebtedness may be purchased by the state treasurer with the assistance and approval of the commissioner of insurance, out of any funds in the state hail insurance fund not necessary to meet the current expenses and losses of the state hail insurance department.

The order overruling the demurrer is reversed.

Birdzell, Ch. J., and Nuessle, Christianson and Burr, JJ., concur.