[File No. 6351.]

STATE OF NORTH DAKOTA, EX REL. P. O. SATHRE, Attorney General, Appellant, v. HAROLD HOPTON, as Commissioner of Insurance, et al., Respondents.

(265 N. W. 395.)

314

Opinion filed February 21, 1936.

*P. O. Salhre,* Attorney General, and *Charles A. Verret,* Assistant Attorney General, for appellant.

*O'Hare, Cox & Cox,* and *C. G. Bangert,* for respondent.

CHRISTIANSON, J. This is an action instituted in the district court of Burleigh county by the state of North Dakota on the relation of the attorney general to enjoin the commission of insurance, the state auditor and the state treasurer from performing certain acts required to be performed by them under the provisions of chapter 155, Laws 1935, on the alleged ground that the statute contravenes §§ 175 and 177 of, and article 24 of the Amendments to, the Constitution of North Dakota.

The defendants demurred to the complaint on the ground that it did not state facts sufficient to constitute a cause of action against any of the defendants. The demurrer was sustained and the plaintiff has appealed.

The sole question presented for determination on this appeal is whether chapter 155, Laws 1935, contravenes any of the constitutional provisions invoked by the plaintiff. That statute, so far as material here, reads as follows:

"An Act reducing, defining and limiting the permanent surplus fund of the State Hail Insurance Department to three million ($3,000,000) dollars; declaring the reasons for such limitations thereon; providing the manner of disbursement and refunding of moneys in excess of said sum; repealing all acts or parts of acts in conflict therewith; declaring an emergency.

"Whereas, under the statutes of the State of North Dakota enacted pursuant to constitutional authority there has been created a State Hail Insurance Department of this state and a Permanent Surplus Fund for the prompt payment of hail losses, and

"Whereas, there is contained in said Permanent Surplus Fund, first created by Chapter 77, Session Laws of North Dakota for 1921, as shown by the records of the State Hail Insurance Department, being public records of the State of North Dakota, as of December 31, 1934, the sum of $4,038,865.41, after setting aside a reserve fund of $779,000 for uncollected taxes; and

"Whereas, after more than ten years' experience it has been determined to be an established fact, shown by the records of the State Hail Insurance Department and of the State Treasurer of the State of North Dakota, that the aforesaid Permanent Surplus Fund in the amount now contained therein is substantially in excess of that required or which may be required for the purpose for which it was created, and that such surplus over and above the requirements of said Surplus Fund to carry out the purpose for which said fund was created is not less than $1,038,865.41, and

"Whereas, the experience of the State Hail Insurance Department, as shown by its public records and reports over a period of the last ten years discloses and establishes that the highest demand upon the said Permanent Surplus Fund for the prompt payment of hail losses in any one of said years was the sum of $2,571,000 and that the average year's demand upon said fund for the said ten-year period was the sum of $1,266,000, and

"Whereas, an exhaustive study of the prospective future demands upon said Permanent Surplus Fund has been made, taking into consideration the past experience of the said Hail Insurance Department in administering the State Hail Insurance Act, the past demands upon said Permanent Surplus Fund, the insurable acreage of this state, the average hail losses over a long period of years, the average acreage withdrawals, the yearly and average of hail indemnity tax payments, the effect upon said Permanent Surplus Fund of proposed legislative changes in the existing hail insurance law, and all other known pertinent factors affecting or which might affect the said Permanent Surplus Fund, and

"Whereas, from a careful consideration and study of all of the foregoing facts this Legislative Assembly concludes and finds that the Permanent Surplus Fund aforesaid for the payment of all claims and

demands present and future against it exceeds by $1,038,865.41 the amount needed and necessary to carry out the original purpose for which said fund was created, and that to the extent of $1,038,865.41 there is a permanent surplus in said Permanent Surplus Fund which is not needed or necessary to carry out the original purpose for which said fund was created, and which said surplus in said fund cannot at this time or in the future be used for such original purpose, and in fact is an unexpended balance over and in excess of any claim or demand, present or future, which may be made against said Permanent Surplus Fund, and

"Whereas, an emergency exists in this that due to crop failures and a world-wide depression there is insufficient money available through the normal tax statutes of the State of North Dakota to keep open and properly maintain the public school system of this state and that unless immediate and direct help be given, many of the elementary public schools within this state will cease to function, now, therefore,

"Be it enacted by the Legislative Assembly of the State of North Dakota:

"Section 1. Permanent Surplus Fund; Transfer and/or Refund.) There is hereby created, defined and shall hereafter be maintained a permanent surplus in the sum of three million ($3,000,000) dollars in the State Hail Insurance Fund, for the purpose of carrying out the provisions of this act, and to enable the State Hail Insurance Department to pay hail losses promptly. All funds in such Permanent Hail Insurance Fund on December 31st, 1934, in excess of three million ($3,000,000) dollars shall be transferred or refunded by the Commissioner of Insurance in the manner herein provided.

"Forthwith after the taking effect of this act it shall be the mandatory duty of the Commissioner of Insurance to pay all of such funds in said permanent surplus fund in excess of three million ($3,000,000) dollars, as shown by the books of the State Hail Insurance Department as of December 31st, 1934, namely one million, thirty-eight thousand, eight hundred sixty-five dollars and forty-one cents ($1,038,865.41) to the State Treasurer to be by him credited to the State Equalization Fund, created and established by Chapter 229, Session Laws of 1933, and acts amendatory thereof or supplemental thereto, or to any fund

which may be established and created to replace such State Equalization Fund; provided, however, that should the aforesaid allocation or distribution of such transfer from said fund be held to contravene the provisions of the Constitution, then and in that event said $1,038,-865.41, after such determination by the Supreme Court of this state, shall be paid to the treasurer of the several counties of the state in the following proportions; such payment to each of the said county treasurers shall be an amount bearing the same ratio to the total amount paid to all county treasurers as the number of acres of tillable land upon which the one cent per acre flat tax was levied in the year 1927 in such county bears to the total number of acres so taxed in the entire state in the year 1927. Upon receipt of such payment, it shall be the duty of each county treasurer to refund such payments, by crediting upon his tax records each tract of land upon which such flat tax was levied in the year 1927, its pro-rata share of the sum so paid to the county treasurer, which credit shall be applied in payment of any outstanding school taxes due on said land in the reverse order of the years in which such taxes were levied, to the extent of the amount of such credit; provided that if there are no outstanding school taxes upon any part of such land, such credit shall be applied as a credit against any school taxes subsequently levied thereon; provided further, that if there are any unpaid flat hail taxes due on any part of such land, such credit shall first be applied in its entirety against such unpaid outstanding flat hail taxes and the overage, if any, shall be credited against outstanding school taxes; provided, however, that should the allocation or distribution of such refund of taxes be held to contravene the provisions of the Constitution, then and in that event, such refunded hail taxes, after any such holding by the Supreme Court, shall be paid to the then record owner of the land, or his legally qualified agent, against which such flat tax was levied; upon such owner, or his so qualified agent, presenting written application therefor with proof of such ownership, to the treasurer of the county within which such land is located; within thirty days after any such decision; provided, however, that if such record owner or his so qualified agent, fail to make such application or present such proof within such

time, then and in that event, such refunded hail tax shall be credited to flat hail taxes and school taxes as hereinbefore provided;

"Provided, however, that in the case of any land owner other than the original owner of the land, who acquired title to such land subsequent to the first day of January, 1928, such payments, as provided for herein, shall be made directly into the General Fund of the School District in which said land or lands is or are located, and in such event no credit shall be given on the unpaid or subsequent school taxes on such land or lands.

"Provided, further, that in cases where the said refund payment accrues to land, the title of which is in the state or in any board or agency thereof, or in the county, the refund accruing to such land shall be paid into the general fund of the school district in which such land is located.

"Provided, further, that in cases where lands have been sold for taxes to individuals, that the refund shall not be applied to such taxes so sold but shall be applied to the payment of the unpaid taxes subsequent thereto, in the reverse order of their becoming due and delinquent.

"Section 2. Saving Clause.) It is hereby declared that if any of the provisions of this act in any manner contravene the provision of the Constitution, the remaining provisions would have been enacted by this Legislative Assembly even though such provision had been eliminated from the act. Hence, if any of the provisions are found to be violative of the Constitution, the remaining provisions shall not be affected by such invalidity but shall remain in full force and effect."

The State Equalization Fund (into which it is directed that the $1,038,865.41 be transferred) was established by the legislative assembly in 1933 to provide aid for the public schools of the state. The purpose of the fund was declared as follows in the title of the act (chapter 229, Laws 1933) by which it was created:

"An Act to establish a State Equalization Fund, and to provide for distributing one-half thereof among the School Districts of the State in proportion to the number of children of school age therein; to provide for the distribution of the remaining half among the elementary schools of the State which are unable to raise sufficient money to

defray the minimum cost thereof plus the amount required to be paid for high school tuition, and to make it the duty of the State Superintendent of Public Instruction to determine such minimum cost of operating elementary schools."

The constitutional provisions which it is alleged are contravened by chapter 155, Laws 1935, read as follows:

Section 175: "No tax shall be levied except in pursuance of law, and every law imposing a tax shall state distinctly the object of the same, to which only it shall be applied."

Section 177 (as amended): "The legislature may by law provide for the levy and collection of an acreage tax on lands within the state in addition to the limitation specified in § 174 in Article 11 of the Constitution. The proceeds of such tax shall be used to indemnify the owners of growing crops against damages by hail, provided that lands used exclusively for public roads, rights of way of common carriers, mining, manufacturing or pasturage, may be exempt from such tax."

Article 24 (Amendments): "The legislative assembly may by law provide for the levy of a tax upon such lands as may be provided by law of the state for the purpose of creating a fund to insure the owners of growing crops against losses by hail; provided, that such tax shall not affect the tax of four mills levied by the Constitution. The legislative assembly may classify such lands of the state as may be provided by law, and divide the state into districts on such basis as shall seem just and necessary and may vary the tax rate in such districts in accordance with the risk, in order to secure an equitable distribution of the burden of such tax among the owners of such land as may be provided by law."

Section 177 and article 24 of the Amendments, supra, were submitted to the people of the State of North Dakota for approval or rejection at the general election in 1918. Both were approved at the election. The State Hail Insurance Department was established by the legislative assembly which convened in January, 1919 (Chapter 160, Laws 1919). The law was amended and re-enacted in 1921 (Chapter 77, Laws 1921). The statute as then adopted provided:

"Section 6. Flat Tax.) There is hereby levied for the years 1921,

1922, 1923, 1924, 1925 upon each and every acre of tillable land in the State, a flat tax of three cents per annum for the purpose of carrying out the provisions of this Act, and creating a permanent surplus in the Hail Insurance Fund to be applied in paying losses more promptly. Provided that lands used exclusively for public roads, rights of way of common carriers, mining or manufacturing purposes, and lands included within the platted portion of any incorporated city, town or village shall be exempt from such tax. All moneys collected under the provisions of this Section shall be paid into the State Hail Insurance Fund but a separate record of such moneys shall be kept by the County and State treasurers.

"Section 7. Indemnity Tax.) The Commissioner of Insurance shall on or before the twenty-fifth day of October of each year ascertain the amount which is required for the total payment of all loss caused by hail to crops insured by the department and a sum sufficient to pay interest at the rate of six per cent on all warrants issued from the first day of December until called for payment by the State Treasurer plus a sufficient sum to maintain and operate the department for the succeeding year, and shall thereupon for the purpose of securing and paying the same levy an indemnity acreage tax sufficient to cover said amount on all cropped land insured (except hay and meadow land) not withdrawn from the operation of this Act as hereinafter specified, provided that the total amount of said indemnity tax shall not exceed in any one year the sum of fifty cents per acre for seven dollars indemnity or seventy-one cents per acre for Ten Dollars indemnity. Provided further that if the sum collected by the maximum levy should be insufficient to pay all losses in any one year, the payment of losses shall be prorated. All moneys collected under the provisions of this Section shall be paid into the State Hail Insurance Fund."

The eighteenth legislative assembly, which convened in January, 1923, amended the above quoted § 6 of the 1921 Act so as to read as follows:

"There is hereby levied for the years 1923, 1924, and 1925, upon each and every acre of tillable land in the State, a flat tax of one cent per annum for the purpose of carrying out the provisions of this act, and creating a permanent surplus in the Hail Insurance Fund to be

applied in paying losses more promptly. Provided, that lands used exclusively for public riads, rights of way of common carriers, mining or manufacturing purposes, and lands included within the platted portion of any incorporated city, town or village, shall be exempt from such tax. Provided, further, that all moneys heretofore or hereafter collected under the provisions of §§ 7 and 10 of this act, over and above that which is required to pay hail losses, also all moneys such as penalties and interest for non-payment of hail taxes and interest on balances already accrued and which may in the future accrue, shall be turned into the permanent surplus as created under the provisions of this section, until such permanent surplus reaches the sum of $4,000,- 000.00; Provided further, that the permanent surplus created under the provisions of this section shall at no time exceed the sum of five million dollars. Provided, further, that whenever the fund as created under this section exceeds five million dollars, such excess levy shall be turned back into the State Hail Insurance Fund to pay losses in the next succeeding year. All moneys collected under the provisions of this section shall be paid into the State Hail Insurance Fund, but a separate record of such moneys collected from such flat tax shall be kept by the County and State Treasurer."

Other provisions of the hail insurance law provided for the listing of lands and the insuring of the crops thereon against loss by hail; but provision was made, also, for withdrawal of lands so listed from the operation of the act, and the indemnity taxes remained in effect only against lands which were not withdrawn.

It is obvious that the two "taxes" prescribed by the statute were of a wholly different character and intended for wholly different purposes. The so-called "indemnity" tax was not a tax at all. It was in effect an insurance premium which the owner of the land either expressly or impliedly consented to pay for the protection afforded. It was not an enforced or compulsory contribution levied by the state by virtue of its sovereignty. It did not owe its existence to any positive act of the government. It rested in each instance, not upon the legislative will, but upon the will of private individuals. Davis v. McLean County, 52 N. D. 857, 204 N. W. 459. The flat acreage tax, however, was predicated upon a wholly different basis. The levy

and collection thereof did not depend upon the consent, either express or implied, of any private individual. It was an enforced or compulsory contribution levied by the state in its sovereign character. It owed its existence to a positive act of the government. The land taxes were subjected to such tax by virtue of positive law. It involved no element of contractual consent on the part of any individual.

It will be noted that it was not contemplated by the legislative assembly that any portion of the flat acreage tax should be utilized to indemnify persons who sustained hail losses. It was contemplated that an indemnity tax should be levied sufficient in amount to defray all hail losses, and that the flat acreage tax should be employed solely to create a permanent revolving fund. In short, it was contemplated that the proceeds of the flat acreage tax should be utilized as a revolving fund and that all payments made therefrom should and would be reimbursed out of the collections of the indemnity tax.

The flat acreage tax was imposed pursuant to Article 24, Amendments to the Constitution, which provides that "the legislative assembly may by law provide for the levy of a tax upon such lands as may be provided by law of the state *for the purpose of creating a fund to insure the owners of growing crops against losses by hail.*" Pursuant to such constitutional authorization the legislature levied, for the years 1921, 1922, 1923, 1924 and 1925; a flat tax of three cents per acre "upon each and every acre of tillable land in the state" for the purpose of carrying out the provisions of the Hail Insurance Act and "creating a permanent surplus in the Hail Insurance Fund to provide for paying hail insurance losses more promptly."

[The object of the statutory provision imposing the flat acreage tax was to create a revolving fund sufficient in amount to enable the hail insurance department to make prompt payment of hail losses. What amount would be required for that purpose was a question of fact to be determined by the lawmakers. To effectuate the intended purpose it was necessary that on the one hand a fund be provided sufficient in amount to enable the hail insurance department to make prompt payment of hail losses without waiting for the collection of the indemnity tax. On the other hand the legislature would not be justified in creating a fund vastly in excess of the amount needed to insure prompt pay-

ment of hail losses. The purpose which the lawmakers declared. it was their intention to accomplish would not have been realized by providing a fund of one thousand dollars as that fund would have been inadequate. On the other hand, it would hardly be claimed that the lawmakers would have been justified in creating a fund of say, twenty-five million dollars, as such fund would clearly have been excessive and the greater portion thereof would not have been needed, and could not have been properly applied to the purpose or object for which the tax was imposed.

In the original enactment the legislative assembly made no attempt to determine in dollars and cents the amount of the permanent surplus or revolving fund. The statute merely provided for the levy of an acreage tax of three cents per acre for a certain number of years. In 1923 the legislative assembly considered the matter again, and it then determined that the amount of tax originally levied was in excess of the probable needs and reduced the amount of the flat acreage tax from three cents to one cent per acre. The legislative assembly then also determined that the amount of the permanent surplus should not be less than four million dollars and should not exceed five million dollars. When the legislative assembly in 1921 and 1923 made provision for the permanent surplus or revolving fund the experience with the state Hail Insurance system was limited, and, hence, the lawmakers had only limited facts on which to predicate their judgment as to the size of the revolving fund that would be required. It will be noted that the legislative assembly in 1923 determined that a much lesser amount would be required then had been contemplated in 1921. And, according to the recitals in the 1935 statute under consideration here, actual experience since 1923,—that is, experience covering a period of twelve years more,—has demonstrated that a permanent surplus of four million dollars is not required to enable the hail insurance department to make prompt payment of hail losses and that a fund of three million dollars is more than adequate to fulfill every purpose for which the flat acreage tax was levied, and the permanent surplus or revolving fund established. In other words, according to the facts recited by the lawmakers in the enactment under consideration here, experience has demonstrated that the object for which the legislative assembly

levied a flat acreage tax has been and will be fully satisfied with a permanent surplus of three million dollars and that all moneys in the fund in excess of that amount constitutes an overplus not needed at all to accomplish or effectuate the object for which the flat acreage tax was levied.]

The several contentions advanced by the appellant resolve themselves to one, namely, that the statute under consideration here diverts the proceeds of the flat acreage tax from the object for which it was imposed, in contravention of § 175 of the Constitution. The respondents concede that § 175 of the Constitution applies to the flat acreage tax and that it is beyond legislative power to divert it from the object for which it was imposed, and this court has so ruled. Brye v. Dale, 64 N. D. 42, 250 N. W. 99. But the respondents contend that the statute in question here does not divert the proceeds of the flat acreage tax from the purpose or object for which it was imposed. They assert that such purpose or object has been fully attained; that the permanent surplus fund of three million dollars fully accomplishes and completes the purpose or object for which the tax was imposed; that the statute merely appropriates an overplus or excess that remains after the object for which the flat acreage tax was imposed has been fully accomplished.

The appellant concedes that where a tax has been imposed for a certain purpose and that purpose has been fully accomplished and a surplus or overplus remains, such surplus or overplus may be appropriated by the legislative assembly for some appropriate public use and that such appropriation will not contravene § 175 of the Constitution. Thus it is conceded that where a tax is imposed to construct a certain specified improvement, as a public building or a bridge, and a surplus remains after the structure has been completed, the surplus may be appropriated by the law-making assembly, because in such case the object for which the tax was imposed has been accomplished. But, appellant contends that in this case there is no unexpended balance and no surplus or overplus. In support of this contention he argues that the hail insurance department still continues; that hail insurance is still being written by the state hail insurance department; that the need for the permanent surplus or revolving fund still exists and, hence, the object

for which the flat acreage tax was imposed has not been accomplished and there is in fact and in law no surplus or overplus.

If given full effect, this argument would make it impossible for the legislative assembly to appropriate a surplus or overplus in a fund even though there was no reasonable probability that the surplus or overplus would be needed or could be expended for the purpose for which the fund was created, and even though such surplus or overplus could readily be segregated from that part of the fund that would be needed to accomplish the object for which the fund was created. It would also inhibit the legislative assembly from appropriating a surplus or unexpended balance where the purpose for which the tax was levied is of a continuing nature or one which in the ordinary course of events is likely to arise again in the future. If this argument be given full validity unexpended balances remaining at the end of a fiscal year, or at the end of a biennium for which an appropriation is made cannot be transferred to other funds. Yet during the entire history of this state our laws have permitted or required the transfer of unexpended balances, both in county and state funds, at the end of the fiscal year for which the taxes were levied or the biennium for which the appropriations were made.

Section 175 of the Constitution provides: (1) that no tax shall be levied unless there is a law authorizing it; (2) that every law imposing a tax shall distinctly state the object of the same; and (3) that the tax shall be applied only to the object stated. The first provision is intended to insure that no officer or body in the state shall or will levy a tax unless there is a law authorizing such levy to be made. The second provision is a restriction upon the power of the legislature, and requires that when it enacts a law imposing a tax such law must state the object of the tax. The third provision is a corollary to the first two. It is a restriction upon the powers of executive and administrative officers as well as upon the powers of the lawmakers, and is intended to prevent them from defeating the first two provisions by resort to subterfuge, by levying a tax ostensibly for one purpose and expending it for another. It inhibits executive and administrative officers from expending moneys resulting from a tax imposed by the legislature for a purpose other than that stated in the law imposing the

tax; and it inhibits the legislature from diverting the moneys from the purpose for which the tax was imposed. We are concerned here with the third provision only in so far as it restricts legislative power. As applied to the legislature, the primary purpose of this provision is to prevent the levy of taxes for some specified purpose or object and by indirection using them for other purposes.

Thus the sole purpose of § 175 of the Constitution is to limit the imposition of taxes to purposes that have been specifically authorized by law and to restrict the levy of any tax to such amount as may be reasonably necessary to accomplish the particular purpose for which the tax is levied. The section is intended to limit and restrict the power of public officers and of the law-making assembly itself as regards the imposition of taxes to the end that taxes may be imposed only for purposes the necessity for which has been determined by law and for such amounts, and such amounts only, as shall be required for the purposes for which the taxes purport to be imposed. But the section is not intended to tie the hands of the legislature as regards the disposition of an excess or surplus on hand after the accomplishment of the object or purpose for which the tax was imposed. The very idea that an excess or surplus which is not needed for the purpose for which it has been raised must lie idle and unused and that the legislature must impose additional tax burdens upon the taxpayers to meet necessary governmental expenses when such burdens can be obviated by an appropriation of the surplus or excess is in conflict with the object that § 175 of the Constitution is intended to accomplish.

The idea that the moneys resulting from a tax must be applied to the purpose for which the tax was imposed implies that that purpose has not been attained; that the proceeds of the tax are needed to accomplish such purpose, and that they actually can be applied thereto. So where the purpose or object for which the tax was imposed has actually or potentially been attained or satisfied, and there remains a surplus which is not needed for the accomplishment of the purpose for which the tax was imposed, then the lawmakers are not inhibited by section 175 of the Constitution from appropriating such surplus to some proper public purpose. Field v. Stroube, 103 Ky. 114, 44 S. W. 363; Whaley v. Com. 110 Ky. 154, 61 S. W. 35; Auditor Gen. v. State

Treasurer, 45 Mich. 161, 7 N. W. 716; State ex rel. Jackson v. Butler County, 77 Kan. 527, 94 P. 1004; Howard v. Huron, 6 S. D. 180, 195, 60 N. W. 803, 26 L.R.A. 498. See also Miller v. Merriam, 94 Iowa, 126, 62 N. W. 689; Goer v. Taylor, 51 N. D. 792, 200 N. W. 898; Boettcher v. McDowell, 43 N. D. 178, 174 N. W. 759.

We see no distinction in principle between an overplus remaining in a building fund after a building has been constructed, and an overplus in a fund like the one involved here,—a fund that has been established to accomplish a certain purpose,—where there is an overplus which can be ascertained and which in the very nature of things cannot and will not be needed to further the object for which the tax was imposed.

In Auditor Gen. v. State Treasurer, 45 Mich. 161, 7 N. W. 716, the Supreme Court of Michigan had occasion to consider the status of an excess in a sinking fund. The Constitution of Michigan provided: "All specific state taxes . . . shall be applied in paying the interest upon the primary school, university and other educational funds, and the interest and principal of the state debt in the order herein recited until the extinguishment of the state debt, other than the amount due to educational funds, when such specific taxes shall be added to, and constitute a part of the primary school interest fund." Michigan Constitution, Article 14, § 1. Conformable to the constitutional provision the specific state taxes had been impounded in a sinking fund for the "extinguishment of the state debt" until there had been accumulated in that fund a sum in excess of the debt. The whole debt was not due until 1890 but in 1881 there had accumulated in the sinking fund a sufficient amount for the payment of the principal. The Auditor General then applied to the Supreme Court of Michigan for a writ of mandamus to compel the state treasurer to transfer the excess of the pledged specific taxes to the primary school fund. The state treasurer contended that inasmuch as the constitution expressly provided that the taxes should be applied in paying "the interest and principal of the state debt . . . *until the extinguishment of the state debt,*" that the funds must remain and tax collections continue to be placed in the sinking fund until the state indebtedness had actually been extinguished.

In a carefully considered opinion (concurred in by the celebrated jurist, Judge Cooley) the court held that for the purposes of the constitutional "requirement, the debt is to be considered 'extinguished' when there is money enough in the state treasury, not subject to other claims, to pay it, even though it has not matured and has not been actually paid." (45 Mich. 161, 162.)

In the opinion in that case the court said:

"The attorney general, speaking on the side of the State treasurer, argues that the words of section one must be taken literally, and that they unavoidably require that the specified annual residuum of these taxes shall be added without interruption or abatement to the fund for the discharge of the State debt and interest, whether needed therefor or not, until they are extinguished.

"The relator's counsel, admitting the literal sense of the provision to be as represented, yet strongly contends that there are insuperable objections to the adoption of a literal meaning. He argues that an attempt to carry out such a construction can end only in rendering the article hopelessly impracticable; that the case is one where it is indispensable to deviate from the literal import and to seek for and accept that ulterior sense which is called for by the end intended; that if this rule is observed all difficulties will disappear, and it will be found that the real object was to make sure provision for meeting the public obligations by means of a scheme imbedded in the Constitution, and that there was no ground or motive for a regulation to gather and impound a fund of indefinite amount, and which could not be put to any use connected with the object of the provision, and would most likely, under the theory of literal interpretation, be screened from any other, and that an intention to effectuate such a state of things ought not to be imputed. . . .

"It was a matter of plain sense that whenever the sinking fund should come to be equal to the principal of the debt nothing would be left to which a further accumulation could possibly apply. Such would be the natural effect. The specification of the object and the express declaration that it should be used therefor would moreover bespeak a purpose to exclude whatever might be accumulated, from any different use. And it was not impossible that the fund might grow

to an equality with the debt before the latter would mature and long before it would be possible to cancel every fraction of it.

"Yet by the terms of the section literally expounded the process of accumulation was not to cease on the acquisition of enough to satisfy the debt and on occasion of the complete exhaustion of the object, but was to be kept up so long as the debt, for any reason, accidental or otherwise, should remain uncanceled. . . . Grant that the literal sense is the true one, and the difficulties indicated are irrepressible. A fund must be drawn from the people for no other end than to be locked up in the treasury until the debt for which it is not needed is finally satisfied by other means, and in the interim, which cannot be measured, the Primary School Interest Fund must be deprived of the incalculable aids which would naturally flow from it if allowed to receive it. The same narrow sense being appropriated to the status of the accumulated excess, and the fund cannot escape being regarded as devoted by the Constitution to an object which, so far as concerns the possibility of application, has no existence.

"It is required that the entire amount brought in under the provision shall be 'applied solely to the payment and extinguishment of the principal of the State debt.' The right to make use of the whole or of any part for any different purpose is excluded. But the amount necessary to take up the debt being on hand under the proper regulation, no debt remains to receive the application. Speaking potentially, it is paid. Among the consequences, therefore, of a literal reading in the case actually before us, we see that the treasury must accumulate what in substance is the same as two funds, one to be the full equivalent of the State debt, being the clear and unquestioned object of the Constitution, and the other an anomaly without utility or object, involving loss to the community and burdening the treasury with care and responsibility without any sound reason.

"This view cannot be maintained, and being rejected, we have not far to seek the natural alternative. What was the substantial object of the Convention as disclosed by the debates and evinced by the result, and what is the spirit and essence of the constitutional provision?

"The final purpose, so far as it concerns our present inquiry to refer to it, was to make certain the preservation of the public faith and the

punctual payment of the existing State debt, together with the interest."

In State ex rel. Jackson v. Butler County, 77 Kan. 527, 94 P. 1004, the Supreme Court of Kansas was required to determine the validity of a statute authorizing the use of any surplus funds that might be in the county treasury to defray the cost of erecting or repairing permanent county buildings. Kansas has a constitutional provision practically identical with § 175 of the North Dakota Constitution. The Kansas court held that the appropriation of the surplus in the county treasury that had resulted from taxes imposed for various other governmental purposes did not constitute a diversion within the purview of the constitution.

In Goer v. Taylor, 51 N. D. 792, 200 N. W. 898, this court had occasion to consider a question relating to the appropriation of moneys in the state bar fund for purposes other than those for which the statute creating the fund had provided that they must be expended. The laws of the state provided for the payment of an annual license fee by every practicing attorney and the deposit of such fee with the state treasurer in a fund to be known as the State Bar Fund "to be disbursed therefrom only in the manner hereinbefore provided to defray the expenses of the State Bar Board." Laws 1919, § 9, chap. 69. In 1923 the legislative assembly amended the state bar board act so as to provide that "from the moneys heretofore accumulated and now on hand in the State Bar Fund, there is hereby appropriated the sum of $10,000.00 to be expended under the direction of the Supreme Court for purchase and repair of books in the State Law Library." Laws 1923, chap. 134, § 9. The members of the State Bar Board brought action, seeking, among other forms of relief: (1) a declaratory judgment declaring that the funds in the Bar Board Fund sought to be appropriated for the purchase and repair of books in the State Law Library "cannot and shall not be impressed with or to other purposes than those expressed" in the Bar Board Act under which the license fees have been collected; and (2) that the statutory provision appropriating such moneys be declared to be unconstitutional and, hence, null, void and of no effect; and (3) that the public officers, charged with carrying out the provisions of the law or expending the moneys appropriated from the State Bar Board Fund be enjoined from so doing. This court

ruled that the plaintiffs in that case had no such interest as to entitle them to assail the constitutionality of the statute.

In discussing the question of the status of the fund, the interest of the plaintiffs, and their right to assail the validity of the act, the court said:

"The act is wholly silent as to what shall be done with any balance that may remain in the fund at the expiration of any annual licensing period or in case the board shall be abolished. We think there is no question but that the legislature in the first instance might properly have provided that any surplus·remaining unexpended after carrying out the provisions of the act should be covered into the general fund of the state, or have made such other provision for the disposition of any resulting surplus as it saw fit; and likewise we think there is no question but that the legislature had and has the power at any time to wholly abolish the board or to make any changes that it sees fit with reference to its membership, their terms of office or compensation. See Cooley, Const. Lim. 7th ed. p. 388 and cases cited at note 2; State ex rel. Langer v. Crawford, 36 N. D. 365, 407, 162 N. W. 719, Ann. Cas. 1917E, 955, and authorities cited. And since the individual contributors who paid voluntarily have no personal and individual interest in the fund, the conclusion is irresistible that the disposition of any unexpended balance remains wholly with the legislature which created it, and which unquestionably possesses the right to abolish the board or change its membership. Having the power to abolish the board at any time, it likewise must have the power to determine and say when the purposes for which it was created have been accomplished." (51 N. D. 801.)

In Boettcher v. McDowell, 43 N. D. 178, 174 N. W. 759, a question was presented to this court as regards the authority of a Board of County Commissioners under § 3288 Comp. Laws 1913, to transfer to the county building fund unexpended balances in the bridge fund. Section 3287 Comp. Laws 1913 authorizes the Board of County Commissioners to create a building fund by resolution when in their judgment there is immediate need for the construction of a courthouse or other necessary building.

Section 3288 Comp. Laws 1913 provides:

"Whenever there remains in the treasury of any county an unexpended balance of any special fund and all claims against such fund have been fully paid, and the purpose for which it was created has been fully subserved and there remains no further use for such balance for the purpose for which it was created, it shall be lawful for the board to transfer such balance to any other fund of the county or subdivisions to which such balance belongs."

The board of county commissioners by resolution transferred $11,-000.00 from the "bridge fund" to the building fund. It was contended that they were without authority to make the transfer for the reason that there were certain outstanding and unpaid claims against the bridge fund. In disposing of that contention this court said in part:

"But it is contended that, since § 3288 only authorizes the transfer when all claims against such funds have been fully paid and the purpose for which it was created fully subserved, no transfer could be made of the bridge fund as a special fund under this section so long as there was any claim whatsoever outstanding against the fund. In our opinion, this contention is without merit, although it must be conceded that it finds plausible support in the literal construction of the section. But the literal meaning is not to be followed in preference to a reasonable construction where it can serve no purpose whatsoever and where it might tend to defeat the manifest object of the section. The manifest interest to be subserved by a statute of this character is to permit the immediate employment, in some authorized direction, of balances which would otherwise presumably lie unused. It thus avoids the necessity of levying added taxes for immediate use while ample funds levied for other purposes lie unused." (43 N. D. 185, 186.)

The reasoning in these authorities is applicable to the question involved in this case, and sustains the rule that where a fund has been created for a certain purpose, and when there has accumulated in that fund a surplus or overplus over and above that needed to accomplish the purpose for which the fund was created, that such surplus or overplus may be segregated from that which is needed for the accomplishment of the purpose for which the tax was levied and the fund created,

and may be appropriated by the legislative assembly as any other unappropriated moneys belonging to the state.

In this case a fund was established for the sole purpose of enabling the state hail insurance department to pay losses more promptly, and a tax was imposed to provide the moneys for the fund. Prior to the time the fund was established hail losses were paid by warrants drawn in anticipation of the collection of the indemnity taxes. As a result persons who had sustained hail losses were not in fact paid in money for a considerable time after the losses had been sustained and adjusted. The permanent surplus, or revolving fund, was established to obviate this condition. While the authority to establish the revolving fund is imbedded in the constitution, it was for the legislature to determine whether, and when, the fund should be established, as well as the amount of the fund. During the first two years of the existence of the state hail insurance department no fund was established. The legislature having determined to establish the fund, it must, of course, impose a tax to provide the requisite moneys. The legislative duty in imposing such tax was not essentially different from that performed in imposing a tax to provide moneys for a fund for the payment of a debt, or for a building fund. If after the tax had been collected it became obvious that there was in the fund not only sufficient moneys to fully accomplish the purpose for which the tax was imposed, but a surplus or excess which was not needed and which could not be used to accomplish such purpose, then such surplus or excess would stand in no different position than a surplus or excess resulting from a tax levied for any other purpose, and remaining on hand after the accomplishment of the purpose for which the tax had been levied.

The statute in question here clearly discloses that whatever doubts the members of the legislative assembly may have entertained as regards their power to act they had no doubt as to the existence of an excess or overplus in the revolving fund,—an excess not needed at all and which in the nature of things could not be devoted to the purpose for which the tax had been imposed. Nor did they leave any room for doubt as to their intention to put such excess, which they carefully segregated and identified, to such appropriate use as they were empowered to put it.

The lawmakers did not content themselves merely with stating their ultimate conclusions. They recited in detail the facts upon which their judgment was based as to the amount that ·is or will be required for the purpose for which the tax was imposed.

According to the facts recited by the lawmakers in the preamble to the statute under consideration here there had in effect grown up two funds: (1) the permanent surplus to be employed as a revolving fund in paying hail losses more promptly; and (2) an excess or overplus over and above the fund needed for such purpose,—a sum of money not needed and which in the very nature of things could not be employed at all for the purpose for which the fund had been created and the tax imposed.

If the legislative assembly had deemed it desirable so to do it could have abolished the hail insurance department altogether and appropriated all unexpended balances in the permanent surplus fund to any appropriate public purpose. If the legislative assembly had abolished the hail insurance department, then the moneys in the permanent surplus fund would have been the property of the state (Fisher v. Steele, 39 La. Ann. 447, 1 So. 882–886), unpledged and unappropriated, and the legislative assembly might have appropriated it for any public purpose for which it might appropriate state funds. In that case the provisions of section 175 of the Constitution would have had no application because the purpose for which the tax had been imposed would have been ended and the appropriation by the legislative assembly for another lawful purpose would not have constituted a diversion of a tax from the purpose for which it had been imposed. However, the lawmakers did not abolish the hail insurance department and thus put an end to the need for any revolving fund to enable the prompt payment of hail losses. They did, however, re-examine the whole matter and upon such examination they found that the moneys that had accumulated in the permanent surplus or revolving fund were greatly in excess of what was needed for the purpose for which the fund had been created. They considered the maximum amount of the accumulated moneys that would be needed as a permanent surplus or revolving fund and they specifically provided that these moneys should be applied only for the purpose for which they had been collected. After having

ascertained the amount that would be needed they also determined the amount of the excess or overplus,—that which remained over after the purpose for which the tax that had been imposed had been accomplished and they appropriated this overplus to a proper public purpose. If the lawmakers had found that the amount in the permanent surplus fund was too small instead of excessive, it would have been within their power to have made another tax levy to provide additional funds. Having found as they did (and the correctness of their findings is not challenged in any manner)—that there remained an overplus or surplus that in no reasonable probability would or could be applied for the purpose for which the tax had been imposed, the lawmakers had the right to appropriate such overplus in the same manner as they might have disposed of a surplus remaining, say, in a building fund after the building had been constructed, or in a sinking fund after a debt had been paid.

[The record here does not disclose a situation where the lawmakers resorted to a device to divert moneys realized from a tax that had been levied for one purpose and was still needed for that purpose to some purpose other than that for which the tax was imposed. On the contrary, the only reasonable deduction that can be drawn from the facts recited by the lawmakers is that the money which they appropriated was in fact and in law an actual surplus or overplus which was not needed, and could not be utilized for the purpose for which the tax had been imposed.]

We are not called upon to review the correctness of the legislative determination of facts. It must be presumed that the lawmakers had before them, when the statute was enacted, any evidence that was required to enable them to act; the specific findings in the statute are presumed to be correct and the passage of the statute itself must be deemed the finding by the lawmakers of the existence of the facts which justified the enactment thereof. State ex rel. Linde v. Packard, 35 N. D. 298, 317, 160 N. W. 150, L.R.A.1917B, 710.

We have no power to supervise the acts of the legislature or substitute our judgment for its judgment upon any matter within the scope of its constitutional powers. Our authority is limited to an in-

quiry into and a determination of, the question whether the legislature has exceeded its constitutional powers.

"Every reasonable presumption is in favor of the constitutionality of a legislative enactment, as it is presumed that the legislature acted within its constitutional powers and enacted a valid law. This presumption is conclusive unless it is clearly shown that the enactment is prohibited by the state or Federal Constitution. State ex rel. Linde v. Taylor, 33 N. D. 76, 156 N. W. 561, Ann. Cas. 1918A, 583, L.R.A. 1918B, 156.

"The primary duty of the courts is to construe statutes with reference to the Constitution, and it is only when a statute clearly violates the provisions of the Constitution that the courts may declare the statute to be unconstitutional. 6 R. C. L. p. 103." State ex rel. Linde v. Packard, 35 N. D. 298, 317, 160 N. W. 150, L.R.A.1917B, 710.

[This case readily distinguishes itself from Brye v. Dale, 64 N. D. 42, 250 N. W. 99. That case did not involve the appropriation of a surplus or overplus. In that case the legislative assembly did not purport to appropriate a surplus or overplus. On the contrary, in the statute there involved it was presumed that there was no overplus or surplus. And it was sought under the guise of a loan to divert money which, according to the statute, continued to be needed for the purpose for which the tax had been imposed.

It follows from what has been said above that the appropriation by the legislative assembly of the excess in the permanent surplus or revolving fund and transfer thereof to the state equalization fund does not contravene §§ 175 and 177 of the state Constitution or article 24 of the Amendments thereto. It becomes unnecessary therefore to consider the validity of the alternative methods for disposal of such excess provided in the statute. The order appealed from is correct. It must be and is affirmed.]

BURKE, Ch. J., and MORRIS and NUESSLE, JJ., concur.

BURR, J. (dissenting). For several years the tillable land of this state was taxed to create a permanent surplus fund for the protection of crops against hail, and now, through the medium of chapter 155

of the Session Laws of 1935, the legislature seeks to divert to the state equalization fund, for an entirely different purpose, over one million dollars of this fund, upon the theory that the purpose for which the tax was levied has been accomplished and that this amount is surplus.

It is not disputed that where a fund is created by taxation for a certain definite, specific object, and this object is accomplished, any incidental surplus there may be remaining in the fund can be converted to the general fund for such other purpose as the legislature may determine. No tax-levying body can determine to the last cent the amount necessary to be raised for a purpose to be completed in the future nor how much can be collected. State ex rel. Jackson v. Butler County, 77 Kan. 527, 94 P. 1004, 1007. Where after the purpose has been completely fulfilled some money remains in the fund, such money cannot be returned to the taxpayers proportionately. It belongs to the general public and may be converted by its agents to some public purpose. But that is not the situation confronting us here.

The statute under consideration is loaded down with numerous "whereases." These are not a part of the law. They constitute a preamble that throws light upon the purpose of the legislature. They show us the legislature believed itself confronted with a grave emergency, that it believed there was "insufficient money available through the normal tax statutes of the state of North Dakota to keep open and properly maintain the public school system of this state and that unless immediate and direct help be given, many of the elementary public schools within this state will cease to function. . . ." Being concerned over this condition, the legislature looked around for some source of supply and seeing that there was a little over four million dollars in the "permanent surplus fund for the prompt payment of hail losses"—an amount of money raised by taxation for an entirely different object—determined to divert part of this fund to the laudable purpose in mind. But the end never justifies the means. Where the end desired is praiseworthy, the means by which it is accomplished become the all-important factor and these means must be justified by law and good conscience. The farm owner now finds that taxes which he paid for the purpose of protecting himself against the hazards of

nature are to be used for a totally different purpose. That this is the purpose is evident from consideration of the portion of the law quoted. This money is to be diverted to the "state equalization fund, created and established by chapter 229, Session Laws of 1933." Thus cities and villages, not in any way taxed for this fund, that have never contributed one cent to the fund, are to be the beneficiaries of a trust fund raised by the taxation of agricultural and tillable lands for the protection of crops against hail.

In order to give plausibility to the actual fact of diversion, it is said there is a surplus in this permanent surplus fund. This must mean that the purpose for which this fund was created has been completed and a surplus remains, that the fund can no longer be used for the original purpose. Therefore, being public money, it may be converted to another object. To my mind this is based on the fallacy that the purpose for which the money is raised has been accomplished. The hail insurance department has not been wound up. It does not cease to exist. The state is not going out of the business of insuring crops against hail. The purpose for which the fund was raised is still in existence. The permanent surplus fund (what is left of it) is still to be used and "applied in paying losses more promptly." Not only this, but under the law in force when the surplus fund reached five million dollars, through the medium of this tax, of penalties and interest for nonpayment of hail taxes, and of interest on balances, the money was not to be used for any other purpose than the object sought to be obtained through the hail insurance department, for the excess over the five million was to be applied upon the payment of losses for the next succeeding year and thus reduce the assessments for that year.

The defendants argue that because the legislature of 1935 in its discretion, as shown by the numerous "whereases" which precede the law, decided that the former legislature was too cautious in its judgment as to the amount necessary for the future, and that the former legislature could well have limited the fund to three million dollars, therefore this conflict of legislative judgments shows a surplus. If the legislature can determine that the presence of four million dollars in the permanent fund shows a surplus of one million dollars, there is nothing to hinder a subsequent legislature from determining that

the three million dollars left shows a surplus of a million dollars, and later another legislature determine that anything over a million dollars was a surplus, and thus the permanent fund raised by taxation for a specific purpose be whittled away. Thus would be done by indirect methods what could not be done directly because of constitutional provisions.

I realize that an emergency creates impatience of restraint, and the greater the emergency and the more pressing and laudable the end desired, the greater is the strain on constitutional provisions. It is a commonplace and persistent statement with all judicial bodies that the wisdom and purpose of legislation is for the lawmaking body to determine. The courts do not pass upon the wisdom of the measure. But the courts are required to say whether the means adopted are permissible. If a supposed law clearly violates the constitution, then it is not a law in the proper sense even though the forms of enactment may be preserved.

A perusal of the law shows that the legislature itself had great doubts as to the validity of this measure, because it specifies various methods of distribution to be followed seriatim and a saving clause in case unconstitutionality is established.

In Brye v. Dale, 64 N. D. 41, 250 N. W. 99, we were required to pass upon the validity of Chapter 64 of the Session Laws of 1933 which sought to transfer and loan "to the real estate bond interest payment fund from the Permanent Hail Surplus Fund the sum of $500,000.00, to be used in the payment of interest now due, or to become due, on said bonds. . . ." We held unanimously that such loan was a diversion and unconstitutional under "§§ 175, 177 and article 24 of the Amendments to the Constitution of the state of North Dakota." In the opinion we showed that in these constitutional provisions it was stated specifically "how taxes so raised shall be applied and certainly the legislature did not have authority to use it for any purpose except the purpose specifically mentioned in the Constitution, namely: the creating of a fund to insure against losses by hail. A fund created under these provisions of the Constitution is beyond the power of the legislature to use in any way except as authorized in the Constitution." Further we said: "There is no question but what a plain

diversion of the fund would be a violation of the Constitution, but it is the contention of the respondent that under the act of 1933 the transfer of the fund is a loan." We then showed the meaning of the word "diverted" and held that even a temporary loan or transfer is a diversion, and we said: "In the instant case the fund to insure against losses by hail is a special fund provided for in the Constitution itself."

The majority opinion says this decision, rendered in the latter part of, 1933, is readily distinguished from the case at bar because the legislature did not purport to appropriate a surplus and says very succinctly that "It was sought under the guise of a loan to divert money which, according to the statute, continued to be needed for the purpose for which the tax had been imposed." It is true this claim of surplus was not raised. Evidently the legislature of 1933 did not consider there was a surplus in this permanent fund or it might have authorized a gift instead of a loan. It may well be said here that, under the guise of a "surplus," the attempt is made not merely to borrow from the fund, but to take from it permanently money raised for an entirely different purpose, which purpose is not yet accomplished for the Hail Insurance Department is still in existence and a Permanent Surplus Fund is still necessary.

The Michigan case cited in the majority opinion—45 Mich. 161, 7 N. W. 716—is readily distinguishable from the case at bar. The money involved therein was part of a sinking fund created to pay a certain definite and ascertained debt and no other. There was no possibility of any increase of that debt. There were no unknown quantities to be guarded against. The payment of the bonds ended the purpose. Had the debt been paid at that time or any subsequent time, there would be a balance remaining in the fund. The court went to the extent of saying in effect we will consider done that which ought to be done or which will be done, and as it is a mathematical certainty there will be money left over when the debt is paid, we may as well use the remainder now. Even this is a doubtful reasoning and suggests a desire to take time by the forelock. However, the situation pictured there cannot be said to be the situation here. Because in the numerous "whereases" which precede the law the legislature says the experience gained in the last ten years has shown the highest demand for the prompt

payment of losses to be the sum of two million five hundred and seventy-one thousand dollars ($2,571,000) and the average for a ten-year period one million two hundred and sixty-six thousand dollars ($1,266,-000), therefore the legislature will assume that in the future the greatest annual demand will not exceed this sum of three million dollars ($3,000,000). Now this, even with the benefit of ten years of experience, is speculative. Who knows what may be the damage caused by a state-wide hailstorm? Not unknown was the amount involved in the Michigan case. The two situations are entirely different.

A number of cases are cited showing the right of the legislature to dispose of a surplus. These are not applicable here because we must first assume there is a surplus. These cases are dealing with a situation where the object of the levy has been accomplished and, as said in Field v. Stroube, 103 Ky. 114, 44 S. W. 363, "The surplus remaining after the object of a levy has been accomplished must be treated as a part of the general funds. . . ." Under the law there was to be a permanent surplus fund of four million dollars, and if it exceeded five million dollars provision was made for the use of the excess. Assessments would be reduced and it is conceivable that in some years no assessments would be needed. Under this declared purpose the tax was levied. The amount of the fund is as much a part of the purpose of the act as the object itself.

The case of Goer v. Taylor, 51 N. D. 792, 200 N. W. 898, cited in the majority opinion is not applicable here. There this court had under consideration a matter wherein we held the plaintiffs had no interest in the fund under consideration so as to give them the right to challenge the constitutionality of the act. However, on page 801, we showed that the fund under consideration in that case was "not analogous to a sinking fund, a special assessment fund or to any other tax fund created for a particular purpose which has not been accomplished or discharged." We were therein discussing an annual license fee, where each year there was a surplus, and the statute involved itself makes provision for the disposition of this surplus.

Mere declaration by the legislature that there is a surplus does not make it a surplus. The term "surplus" must be determined in the light of the situation involved. A man who pays a four-dollar debt

from a five-dollar bill may be said to have a surplus of one dollar in that respect; but when we speak of a surplus in the "Permanent Surplus Fund" we must necessarily mean that which remains when use or need is satisfied, the excess, the overplus, "That which is left from a fund which has been appropriated for a particular purpose." Bouvier. When the permanent surplus fund is completed and that feature of the hail insurance is wound up, if there be anything left over, it will be surplus; but for the legislature to consider that because in its judgment more is provided than what is now deemed necessary, therefore the difference is a surplus, will result in the very thing the constitution forbids—the application of the proceeds of the tax to a purpose other than that for which it was levied.

It is not the judgment of a changing legislature which creates a surplus, nor the varied judgments of representative men. Facts exist independent of such judgment. For the legislature to determine that there is a surplus in the permanent surplus fund when that fund is still in existence and still being used for the purpose for which it is created, and no one can tell what annual demand may be made upon it, is simply proof that the emergency affected judgment and impelled distraught public servants to a course forbidden by the constitution. But a praiseworthy object does not justify statutory embezzlement.